**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CACI PREMIER TECHNOLOGY,
INCORPORATED; CACI INTERNATIONAL,
INCORPORATED,

        *Plaintiffs-Appellants,*

v.

RANDI RHODES; PIQUANT, LLC, d/b/a
Air America Radio,

        *Defendants-Appellees.*

---

ALM MEDIA, INCORPORATED; THE
ASSOCIATED PRESS; COX
COMMUNICATIONS, INCORPORATED;
DOW JONES AND COMPANY,
INCORPORATED; GANNETT,
INCORPORATED; THE HEARST
CORPORATION; LANDMARK
COMMUNICATIONS, INCORPORATED;
MAGAZINE PUBLISHERS OF AMERICA;
NBC UNIVERSAL, INCORPORATED; THE
NEW YORK TIMES COMPANY; THE
NEWSPAPER ASSOCIATION OF AMERICA;
NEWSWEEK, INCORPORATED; THE
RADIO-TELEVISION NEWS DIRECTORS
ASSOCIATION; THE REPORTERS
COMMITTEE FOR FREEDOM OF THE
PRESS; TIME, INCORPORATED; THE
WASHINGTON POST,

        *Amici Supporting Appellees.*

No. 06-2140

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:05-cv-01111-GBL)

Argued: January 31, 2008

Decided: August 5, 2008

Before MICHAEL, GREGORY, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Michael wrote the opinion, in which Judge Gregory joined. Judge Duncan wrote a separate opinion concurring in the judgment.

**COUNSEL**

**ARGUED:** Joseph William Koegel, Jr., STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Appellants. Laura Rose Handman, DAVIS, WRIGHT & TREMAINE, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** John F. O'Connor, Frank H. Griffin, IV, STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Appellants. David M. Shapiro, DAVIS, WRIGHT & TREMAINE, L.L.P., Washington, D.C., for Appellees. Jack M. Weiss, Joshua Wilkenfeld, Laura M. Leitner, GIBSON, DUNN & CRUTCHER, L.L.P., New York, New York; Theodore B. Olson, Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Amici Supporting Appellees.

**OPINION**

MICHAEL, Circuit Judge:

This defamation case centers on the notorious U.S.-run Abu Ghraib prison in Iraq. Abu Ghraib prison is the place where Iraqi detainees were subjected to horrific abuse. It is also the place where plaintiffs, CACI Premier Technology, Inc. and CACI International Inc. (together, CACI), interrogated Iraqi detainees for the U.S. military. Defendant Randi Rhodes, a talk-radio host, blamed CACI in part for the Abu Ghraib abuses on her show, which was broadcast by defen-

dant Piquant, LLC, d/b/a Air America Radio (Air America). In her scalding accusations against CACI — a military contractor with public figure status — Rhodes relied on a number of reputable sources, including two U.S. Army reports and the statements of an army brigadier general who was once the head of U.S. detention facilities in Iraq. Rhodes and Air America moved for summary judgment after CACI sued them for defamation. The district court granted the motion, concluding that Rhodes's statements were protected by the First Amendment, either because they were not made with actual malice or because they did not state actual facts about CACI. We affirm.

I.

A.

CACI is a U.S. government contractor that provides intelligence services to the military. CACI's principal place of business is in Virginia. In the post-invasion phase of the war in Iraq, CACI (beginning in September 2003) provided civilian interrogators for the U.S. Army's military intelligence brigade assigned to the Abu Ghraib prison, near Baghdad.

Air America is a liberal talk radio network. Air America's broadcasts reach the Commonwealth of Virginia through satellite radio and at least one commercial station. Rhodes began hosting The Randi Rhodes Show on Air America in March 2004. Her show aired for four hours daily during the week. Rhodes, a former member of the U.S. Air Force, views the war in Iraq as a "disastrous mistake." J.A. 126. She laced her show with fierce and colorful criticism of the President, the civilian leadership at the Pentagon, and military contractors for their role in the "initiation and continuation of the war." *Id.* Rhodes accepts *New York Magazine*'s characterization of her style as "shrill, screeching," and "hectoring, cocksure." *Id.* She also admits to making frequent use of hyperbole, a common tool of the talk radio host, in criticizing "everything having to do with the war in Iraq." J.A. 127.

During the Saddam Hussein regime the Abu Ghraib prison "was one of the world's most notorious prisons, with torture, weekly executions, and vile living conditions." J.A. 318. Just before the 2002 invasion, the regime, aiming to create havoc for coalition forces, released

the detainees held at Abu Ghraib prison and other facilities. After the invasion the then-empty Abu Ghraib was taken over by the U.S. military for use as a detention facility for three detainee (or prisoner) categories: (1) common criminals, (2) security detainees accused or suspected of committing offenses against the Coalition Provisional Authority, and (3) "high value" detainees who might possess useful intelligence (insurgency leaders, for example). J.A. 318. The detainees at Abu Ghraib included women and juveniles. A U.S. Army military police brigade and a military intelligence brigade were assigned to the prison. The intelligence operation at the prison suffered from a severe shortage of military personnel, prompting the U.S. government to contract with CACI to provide civilian interrogators and with Titan Corporation (Titan) to provide civilian interpreters.

Abu Ghraib prison returned to public awareness with searing intensity in late April 2004 when CBS on *60 Minutes II* broadcast an extended report, with sickening photographic evidence, about U.S. soldiers abusing and humiliating Iraqi detainees at Abu Ghraib. The broadcast showed photographs of naked detainees stacked in a pyramid; a photograph of two naked and hooded detainees, positioned as though one was performing oral sex on the other; and a photograph of a naked male detainee with a female U.S. soldier pointing to his genitalia and giving a thumbs-up sign. Another photograph showed a hooded detainee standing on a narrow box with electrical wires attached to his hands. A final photograph showed a dead detainee who had been badly beaten. U.S. soldiers were in several of the photographs, laughing, posing, or gesturing. The abuses stunned the U.S. military, public officials in general, and the public at large.

Civilian interrogators and interpreters, operating under military contracts, were also responsible for detainee abuse at Abu Ghraib, according to media reports that were essentially contemporaneous with the *60 Minutes II* broadcast. Rhodes closely followed "the Abu Ghraib story [after] the shocking pictures were first broadcast on *60 Minutes [II]* in April 2004." J.A. 130. By the time Rhodes made the statements on her show in August 2005 that CACI challenges as defamatory, Rhodes had read a number of published reports that CACI interrogators at Abu Ghraib had abused detainees and directed or encouraged the abuse of detainees. These sources included two official military reports, a published interview of the brigadier general

formerly in charge of U.S. prisons in Iraq (including Abu Ghraib), news articles, and a journalist's speech. In addition to dealing with CACI's role at the Abu Ghraib prison, some of these sources also discussed the Pentagon's extensive use of military contractors in Iraq, a regular topic on Rhodes's show. We highlight some of the relevant information revealed in Rhodes's sources that are included in the record.

Concerns about abuse to detainees at the Abu Ghraib prison prompted Major General Antonio M. Taguba's investigation and report (Taguba report) on the 800th Military Police Brigade assigned to the prison. The Taguba report, made public in May 2004, found that both military and civilian contractor (CACI and Titan) personnel were responsible for "numerous incidents of sadistic, blatant, and wanton criminal abuses . . . inflicted on" Abu Ghraib detainees. J.A. 495. Words like "horrific" and "extremely disturbing" were also used to describe the abuses. J.A. 520, 494. Major General Taguba's investigation led him to suspect that an army colonel and lieutenant colonel and two civilians, Steven Stephanowicz (a CACI employee) and John Israel (a Titan employee), "were either directly or indirectly responsible for the abuses at Abu Ghraib." J.A. 519.

Major General Taguba documented the following acts of abuse, among others: punching, slapping, and kicking detainees; using unmuzzled military dogs to frighten, and in one case to bite, detainees; breaking chemical lights and pouring the phosphoric liquid on the detainees; positioning a naked detainee on a box with a sandbag on his head and attaching wires to his fingers, toes, and penis to simulate electrical torture; sodomizing a detainee with a chemical light and perhaps a broomstick; having sex with a female detainee and threatening male detainees with rape; stacking naked male detainees, handcuffed and shackled, in piles so that each one's penis touched the buttocks of another; videotaping and photographing naked male and female detainees; forcibly arranging detainees in sexually explicit positions for photographing; forcing groups of male detainees to masturbate while being photographed and videotaped; and taking photographs of dead Iraqi detainees.

Major General Taguba concluded that Stephanowicz of CACI shared responsibility for the abuse because he "[a]llowed and/or

instructed MPs [military police] . . . to facilitate interrogations by 'setting conditions' which were neither authorized [nor] in accordance with applicable regulations/policy." J.A. 519. "Setting conditions" was a euphemism for using abuse to break the will of a detainee being interrogated. Major General Taguba found specifically that Stephanowicz "clearly knew his instructions [to MPs to 'set conditions'] equated to physical abuse." J.A. 519.

As information about the Taguba report began to emerge, the *Guardian*, a British newspaper, reported on April 30, 2004, that some of the soldiers accused of abuse at Abu Ghraib "claimed to be acting in part under the instruction of mercenary interrogators [CACI employees] hired by the Pentagon." J.A. 339. In a May 10, 2004, article in the *New Yorker*, "Torture at Abu Ghraib," investigative journalist Seymour Hersh wrote that the Taguba report described an Abu Ghraib where "much of the day-to-day management of the prisoners was abdicated [by military police] to Army military-intelligence units and civilian contract employees," who relied on intimidation and torture to gather intelligence. J.A. 323. Two months later, on July 8, 2004, Hersh spoke at an American Civil Liberties Union conference. There, Hersh said that acts that were even more atrocious — and yet to be disclosed by the government — were committed at Abu Ghraib:

> Some of the worst things that happened . . . you don't know about. . . . [W]omen [prisoners at Abu Ghraib] were passing messages out [to their families] saying please come and kill me because of what's happened. And basically what happened is that those women who were arrested with young boys, children, in cases that have been [video] recorded, the boys were sodomized, with the cameras rolling, and the worst above all of them is the soundtrack of the boys shrieking.

J.A. 331 (fourth alteration in original).

In August 2004 a second U.S. Army report provided further details of the abuses at Abu Ghraib. This report (the Fay/Jones report), issued by Major General George R. Fay and Lieutenant General Anthony R. Jones, focused on the military intelligence brigade assigned to the prison. The Fay/Jones report confirmed CACI employee involvement

in detainee abuse. To begin with, the Fay/Jones report revealed that several soldiers at Abu Ghraib said that they were supervised by CACI employees. Another soldier "indicated that CACI employees were in positions of authority, and appeared to be supervising government personnel." J.A. 609. The statements were confirmed by a prison organizational chart that showed a CACI employee as head of the DAB (Detainee Assessment Branch), with soldiers as his subordinates. Moreover, as the earlier Taguba report indicated, the fact that CACI and Titan employees wore desert camouflage uniforms caused confusion in the chain of command.

The Fay/Jones report expanded on the Taguba report in describing "shameful events" of abuse to detainees at Abu Ghraib "that violated U.S. criminal law" or "that w[ere] inhumane or coercive without lawful justification." J.A. 545, 528. According to the report, the abuse, "ranging from inhumane to sadistic," was inflicted "by a small group of morally corrupt soldiers and civilians," with CACI and Titan employees making up the latter category. J.A. 527. CACI or Titan employees were responsible in over one-third of the incidents.

The Fay/Jones report detailed forty-four incidents of abuse inflicted by both military and civilian contractor (CACI and Titan) personnel. CACI employees bore responsibility in fully one-fifth, or nine, of these incidents, including the following. *One*, a CACI interrogator, during the questioning of a detainee (an Iraqi policeman) threatened to, and did, call upon an MP to "soften up" the subject. Once enlisted, the MP covered the subject's nose and prevented him from breathing for a short time. At another point, the MP used a collapsible nightstick to push or twist the subject's arm, causing pain. *Two*, a CACI interrogator "grab[bed] a [handcuffed] detainee" from the back of a high vehicle, dropped him on the ground, and dragged him to an interrogation booth. J.A. 637. Each time the detainee "tried to get up," the CACI employee "would yank [him] very hard and make him fall again." J.A. 689. *Three*, a photograph shows a CACI employee and a Titan linguist interrogating a detainee who is being forced to squat on a chair, an unauthorized (and unsafe) stress position. *Four*, at least one CACI employee used unmuzzled dogs to facilitate detainee interrogation. In one instance, "[i]t appeared [that a CACI employee] was encouraging and even directing the MP abuse with dogs; likely a 'softening up' technique for future interrogations." J.A. 645. *Five*, a

CACI interrogator bragged about shaving the hair and beard of a detainee and forcing him to wear red women's underwear.

The Fay/Jones report detailed the account of an allegation that a contract interpreter raped a young (minor) male detainee while a female soldier took pictures. The alleged rapist, who was wearing military clothing, partially matched the description of a Titan interpreter. These allegations prompted the Army's Criminal Investigation Command to open an investigation.

The Fay/Jones report pointed out that the International Committee of the Red Cross, which visited Abu Ghraib, found that many detainees "suspected [of] security offenses or deemed to have intelligence value" were "subjected to . . . both physical and psychological coercion (which in some cases was tantamount to torture) in order to force cooperation with their interrogators." J.A. 622 (internal quotation marks omitted). One detainee death is discussed in the Fay/Jones report. The detainee, who was initially under CIA control and believed to be an insurgent, had been struck in the head with a rifle butt while resisting arrest. The detainee was brought to Abu Ghraib and shortly thereafter was found in a shower stall, handcuffed and dead, with a sandbag covering his head.

Finally, the Fay/Jones report concluded that many of the Abu Ghraib abuses cited could be criminal, and it recommended that its findings with respect to three CACI employees and two Titan employees "be forwarded to the Army General Counsel for determination of whether [the employees] should be referred to the Department of Justice for prosecution." J.A. 689-92. In commenting on the potential referral for prosecution, the *Washington Post*, in an August 26, 2004, article, commented that the Fay/Jones report "provided the clearest view yet of the role contractors [CACI and Titan] played in the prison abuses" at Abu Ghraib. J.A. 313.

In late July 2005 *Editor & Publisher* reported that U.S. Secretary of Defense Donald Rumsfeld had allowed certain members of Congress to view 87 photographs and four videos from Abu Ghraib that the Pentagon had "blocked from release" to the public. J.A. 334. Secretary Rumsfeld described the photographs and videos as "show[ing] acts [against detainees] 'that can only be described as blatantly sadis-

tic, cruel and inhumane,'" and U.S. Senator Lindsey Graham (R-SC) indicated that "they contained scenes of 'rape and murder.'" *Id.*

On August 24, 2005, *TruthOut.org* published an interview with Brigadier General Janis Karpinski, who was (at the relevant time) in charge of U.S. detention facilities in Iraq. In the interview Karpinski charged that "the Military Intelligence people" used "torture practices [at Abu Ghraib that] were developed and implemented down in Guantanamo Bay." J.A. 290. Karpinski had "no doubt in [her] mind" that "the civilian contractors — Titan, CACI" — "ordered these things [the abuses] to be done." J.A. 298. The civilian contractors simply "ha[d] a playground" at Abu Ghraib, and they "g[o]t out of control," according to Karpinski. *Id.*

The Pentagon's widespread use of military contractors in Iraq attracted scholarly and media attention prior to and while Rhodes was airing her shows that are the subject of this case. Rhodes read articles on this topic as well, including the following two. In a 2004 law review article, Peter Warren Singer, a National Security Fellow at the Brookings Institution, wrote about military contractors who "sell everything from small teams of commandos to massive military supply operations." J.A. 257. Singer surveyed current national and international laws and concluded that privatized military services are not effectively regulated. Singer found that

> [s]ome [privatized military] firms have committed severe abuses in the course of their operations and have been employed by dictatorships, rebel armies, terrorist groups, and drug cartels. . . . Given the ultimate importance of the field in which they operate and the potential for serious abuses, a particularly worrying aspect is that the industry's position in the legal sphere remains ambiguous. . . . The result is that [privatized military firms] comprise one remaining industry whose behavior is dictated not by the rule of law, but by simple economics.

J.A. 259-60. In mid-August 2005 the *New York Times Magazine* published a lengthy article about the large-scale use of military (or security) contractors in Iraq. The article discussed the history of mercenary forces, including their involvement on the side of pro-apartheid forces

in South Africa. Some contractors, the article reported, "draw [personnel] from South African veterans of the wars to save apartheid," and one contractor once considered providing "help to Mobutu Sese Seko, the tyrannical dictator of Zaire." J.A. 353, 355.

Armed with the foregoing information and additional accounts from the media, Rhodes, in the period August 10, 2005, through August 26, 2005, devoted parts of her show to the abuses at Abu Ghraib, the issue of military contractor responsibility for those abuses, and the issue of the Pentagon's use of military contractors. CACI's defamation action is based on the following statements that Rhodes made on her show.[1]

> *Statement 1*, August 10, 2005 (torture and rape at Abu Ghraib):

> [T]here are rape rooms and we are doing that and it is grotesque and there was no reason to go and the people that are torturing and raping are using our soldiers to film it and that the ones that are being paid to do this are not our troops but it's CACI and Titan and the people who relieved General Karpinski of her command in Iraq in Abu Ghraib and the other prison she was in charge of were CACI and Titan. They were independent contractors. . . . And the same independent contractors are doing the same grotesque things to little boys and girls now that we said Saddam was — you know. . . .

J.A. 176-77.

> *Statement 2*, August 11, 2005 (torture and rape of children and misrepresentation of authority):

> How about the defense contractors or the oil conglomerates or CACI or Titan International? What's their relationship with the President and why are they allowed to torture and

---

[1]We use the district court's statement numbering and add our parenthetical description of each statement. The statements are taken from the joint appendix, and any stylistic errors or inconsistencies have not been corrected.

rape little children using low-level clerks, who then go to jail for 10 or 15 years? And how come you don't have a responsibility to report on those trials of those low-level specialists who went to jail for 10 or 15 years, who testified that they believed they were working for their government, and really they were working for CACI and Titan, as tools.

J.A. 181-82.

*Statement 3*, August 15, 2005 (mercenaries fought on side of apartheid and oppressive African regimes):

[Y]ou've got to read this *New York Times Magazine* article [about privatized military companies] . . . . [I]t was the cover story, it was the most intensely eye-opening thing I have ever read. No one dared talk about the mercenaries. No one dared talk about all these companies, Blackwater, and CACI, and Titan, and now this new one, Three Canopies, that really didn't even exist until this was started. And then they got this idea, hey let's get a Department of Defense contract and we'll send killers over there. That's exactly what they did. And these people — there's no command and control. They don't report to anybody. They're not loyal to you, they're not loyal to me. They're not loyal to America. They're loyal to the corporation. And they have fought on the side of Apartheid, just like Cheney used to vote against abolishing Apartheid. He loves these guys. These guys literally fought on the side of Mobutu who used to chop peop—, little children's hands off. Why did he do that? Well the purpose of chopping little children's hands off was so that they would grow up as walking billboards for his — as a testament to Mobutu's power. . . . To anybody that might even have a thought about deposing the brutal dictator. And these same guys, same people, that are making up these mercenary companies, same ones, are now over in Iraq doing whatever. And we have no way, there's no law, there's no criminal law that applies to them in Iraq. There's no civil law that applies to them in Iraq.

J.A. 193-94.

*Statement 4*, August 22, 2005 (unregulated contractors and contractor employees):

> But what's sickening is if you're a mercenary, if you go to work for Triple Canopy or you go to work for Blackwater, first of all, there's no laws. You'll never, ever, ever be court-martialed. You can do any damn thing you want to, including torture people. . . . Our soldiers will pay the price, but if you work for a contractor and you're a mercenary, a hired killer, it doesn't matter. You can switch sides. You can do whatever you want. . . . So for those people that just want to kill for the sake of killing . . . call Triple Canopy or call Blackwater or call CACI and Titan, especially if you want to torture people, and never have to come under the long arm of the law. I mean, that's how you get away with murder. . . . [Y]ou've got these fricken mercenaries out there just going crazy. And there's like 30,000 of them. And there's about 80,000 of them, but 30- to 40,000 of them are armed to the teeth and will kill you.

J.A. 202-03.

Statements 5 to 8 are part of the same discussion on August 24, 2005, but we present them separately, as did the district court.

*Statement 5*, August 24, 2005 (rape and murder at Abu Ghraib):

> So there are more photos of Abu Ghraib . . . . [T]here are Congress people who have seen them and they are disgusted by them. There are videos. And, yes, they clearly show rape and murder and, yes, they show they show the rapes of children and, yes, they show the murder of people who have been caught in these dragnets in Iraq. And nobody knows what they've done. And a year later some of them who survive it get released, but if you are in when we decide to murder and rape, then that's your lot in life, according to what some of these people have said. So here are some of the most disgusting images . . . .

J.A. 207.

*Statement 6*, August 24, 2005 (contractors misrepresenting authority):

> And now we have this documentary, photographic, videographic evidence of some of the really sick, twisted stuff that was ordered by our president and his civilian cabinet that was done and carried out, not by generals and not by military people but were ordered by people who work for private contractors, mercenaries if you will. Who then were able to access our kids [soldiers] and tell our kids—we're from special forces, or—we're from the CIA, but you don't need to know who we are but we know who you are and you're going to do this because this is what we want you to do.

J.A. 208.

*Statement 7*, August 24, 2005 (contractors misrepresenting authority):

> And of course it wasn't the military that was taking control of these kids [soldiers]. Janis Karpinski gave an interview, I'll post the interview. It's the most amazing thing how she was shunted aside, told not to go in there anymore, they had control of the prisons and it was obviously the contractors who then misrepresented to our kids who they were and what they were ordered to do.

J.A. 208-09.

*Statement 8*, August 24, 2005 (call for official assignment of responsibility for Abu Ghraib abuses):

> Unless we actually apologize for these [acts], unless we actually have a president of the United States who says— look what's been done here and I know who did it and this is who did it and it was CACI and it was Titan and it was Blackwater and it was Halliburton and it was Bechtel and it was DynCorp. and it was this one and it was Triple —-

whoever it was, and he actually says these people are going to be put on trial and they will be charged with murder, and they will be charged with rape, and they will be charged with molesting children. And they will be charged with crimes against humanity. Until and when and if that happens, the recruitment for Al Qaeda is going to surpass our recruitment capabilities here in the United States.

J.A. 209.

Statements 9 to 11 were part of the same discussion on August 25, 2005.

*Statement 9*, August 25, 2005 (contractors misrepresenting authority):

I was looking at an interview that Janis Karpinski did with a woman named Marjorie Cohn. It's posted on my website, the RandiRhodesShow.com, and it's right next to the pictures of Abu Ghraib Prison and it — that is the choice we made by the way, Abu Ghraib. We chose that, and how did we choose it? The President let those contractors go in there, and he let those contractors lie to our kids, and those kids believed that those contractors were military intelligence units, that they were CIA. But they weren't. They weren't. They were employees of CACI and Titan.

J.A. 214.

*Statement 10*, August 25, 2005 (unregulated contractors misrepresenting authority):

[A]ll [Karpinski] kept hearing from the people in Iraq is this deteriorated into contractor heaven. Mercenaries all over the country, killing people. She said they had no previous training. The ones from CACI and Titan that were sent to the prison, to Abu Ghraib, she said. They were supposed to be interrogators [sic] but that CACI and Titan had offered them a chance to upgrade their employment to interrogators, and

she said it was a deadly mix because they had no training in being interrogators. They were translators. But CACI and Titan was going to pay them more if they would interrogate the prisoners. So they kicked her out of the compound at night, told her she couldn't travel at night to the cell blocks, couldn't come to Abu Ghraib at night, and at night, the little mice would play, and they would play rape the boys, and rape the girls, and pile them high, and they'd use the low-level military people, and they wore military uniforms, too, these contractors. They literally impersonated officers. And no one knows what to do about it because there's no freaking law for them. . . . [W]hat you saw were contractors getting their hands dirty. Contractors getting their hands bloodied. Contractors were the ones that were actually doing the bad stuff, but what you did have in Iraq was an Executive Order 13303, that said there was no law in Iraq. So the only law that anybody that wants to prosecute CACI and Titan, the only law — and believe me, people do — and the only law that they can find to prosecute CACI and Titan is this obscure Department of Defense law . . . . And they don't know what the definition of torture is because of Alberto Gonzales, and so they don't know what to charge them with.

J.A. 217-18.

*Statement 11*, August 25, 2005 (rape of children and contractor inexperience):

They [the Iraqi people] say that the raping of their children and the raping of their children in front of them is no different than Saddam. . . . [T]hese contractors were supposed to help and be translators, and they became the interrogators and they had no experience doing it, and it became this free-for-all . . . .

J.A. 219.

*Statement 12*, August 26, 2005 (contractor employees fought on side of apartheid):

I'm for getting the mercenaries . . . who are not loyal to your [a caller's] son, are not loyal to this country, don't care a thing about democracy, they care about the bottom-line of Triple Canopy or Blackwater or CACI or Titan or DynCorp, and they are some of the most notoriously evil people, and they are getting paid with our tax dollars. These are guys . . . that were for — they would find on the side of the government in South Africa that wanted to keep apartheid. They fought on the side of the government that was literally chopping off young boys' hands because they didn't want to kill them. They wanted them to be handless as little reminders to everybody, that if you stood up to this government, that's what's going to happen to you, and they were like walking billboards for tyranny, for treachery, for murder!

J.A. 235-36.

*Statement 13*, August 26, 2005 (characterizing contractors as hired killers in a discussion with a caller named David):

David:    I really am annoyed that this thing that's being passed on, the cost, for Iraq I'm still going to have to pay for once I'm older.

Rhodes:    Not only are you going to have to pay for the actual bombs and the war and the mercenaries and their billions of dollars that they got. You know you've got guys over there making, what, three thousand dollars a week, three hundred dollars a day.

David:    Yeah the contractors.

Rhodes:    Yeah, don't call them contractors, call them what they are, they're hired killers, they're mercenaries.

David:    Hired killers, yeah.

Rhodes:    Yeah, they're hired killers.

David:    Hired killers from Halliburton.

Rhodes:   They're from everywhere, they're from DynCorp and CACI and Titan in the prisons, and then you've got Triple Canopy and Blackwater.

J.A. 225-26.

B.

In a diversity action filed in U.S. district court in Virginia, CACI sued Rhodes and Air America for defamation under Virginia law. CACI alleges that Rhodes's statements on her show (reprinted above) accuse the company of, among other things, torture, rape, murder, and misrepresenting its authority (with its employees impersonating military personnel) at the Abu Ghraib prison. According to CACI, Rhodes made the statements with reckless disregard as to whether they were false.

Rhodes and Air America made a motion for summary judgment, which the district court granted for the following reasons. *First*, the court concluded that Rhodes's statements (statements 1, 2, and 4) that CACI tortured detainees at Abu Ghraib "are not demonstrably false" (and hence not defamatory). J.A. 1093. In the alternative, the district court held that these statements were not made with actual malice. *Second*, the district court concluded that Rhodes's statements (statements 2, 6, 7, 9, and 10) that CACI employees misrepresented their authority at Abu Ghraib are not demonstrably false. Again, the court held in the alternative that these statements were not made with actual malice. *Third*, the district court concluded that Rhodes's statements (statements 3 and 12) that "likened [CACI and other] independent contractors operating in Iraq, generally, to those that operated in apartheid South Africa" were non-actionable hyperbole. J.A. 1104. *Fourth*, the district court concluded that Rhodes's statements (statements 1, 2, 5, 8, 10, 11, and 13) "regarding CACI's role in the rape and murder of Iraqi detainees at Abu Ghraib," J.A. 1117, were hyperbole, failed to assert actual facts about CACI, or were not made with actual malice. CACI appeals the award of summary judgment to Rhodes and Air America, and our review is de novo, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 694 (4th Cir. 2007) (en banc).

II.

CACI sued Rhodes and Air America for defamation under Virginia law. In Virginia a statement is defamatory *per se* if it, among other circumstances, (1) "impute[s] to a person the commission of some criminal offense involving moral turpitude;" (2) "impute[s] to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment;" or (3) "prejudice[s a] person in his or her profession or trade." *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 591 (1954). A defamatory charge may be made expressly or "by inference, implication or insinuation." *Id.* at 592.

The "application of the state law of defamation" is limited, of course, by the First Amendment to the Constitution of the United States. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14 (1990). This appeal turns on the application of two of these limitations: (1) the actual malice standard that attaches to media coverage of public officials or public figures and (2) the protection for statements that cannot reasonably be interpreted as stating actual facts about an individual. The actual malice standard, announced in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), is rooted in the First Amendment's "vital guarantee of free and uninhibited discussion of public issues." *Milkovich*, 497 U.S. at 22. The standard ensures that defamation cases involving issues of public concern are considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government[,] public officials," and public figures. *New York Times*, 376 U.S. at 270; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335-37 & n.7 (1974); *Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967). Accordingly, a public official or public figure cannot "recover[ ] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80. As we have said, "[e]stablishing actual malice is no easy task, because the defamation plaintiff bears the burden of proof by clear and convincing evidence." *Carr v. Forbes, Inc.*, 259 F.3d 273, 282 (4th Cir. 2001). In reviewing an order granting

summary judgment, an appellate court must independently examine the record to determine whether the plaintiff has proffered sufficient evidence to prove actual malice by clear and convincing evidence. *Id.*; *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989) ("The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.").

The First Amendment also "provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20 (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). This safeguard includes protection for "rhetorical hyperbole, a vigorous epithet" and "loose, figurative, or hyperbolic language." *Milkovich*, 497 U.S. at 17, 21 (citation and internal quotation marks omitted). The safeguard is necessary to "provide[ ] assurance that public debate will not suffer for lack of 'imaginative expression' . . . which has traditionally added much to the discourse of our Nation." *Id.* at 20. Whether a statement can reasonably be interpreted as stating facts about an individual — whether it is rhetorical hyperbole, for example — is a question of law. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) ("The question whether a statement is capable of having a defamatory meaning is a question of law to be decided by the court.").

## III.

Several of Rhodes's statements that CACI claims are defamatory — those about misrepresentation of authority, torture, and rape at Abu Ghraib — will be analyzed under the *New York Times* actual malice standard.[2] We begin with a comment about the importance of the actual malice standard to a wide-open and vigorous discussion of crit-

---

[2]We will assume for the sake of this analysis that these statements assert facts about CACI that are false and defamatory. *See, e.g.*, *Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1331-32 (4th Cir. 1993) ("For purposes of the discussion of actual malice, we will assume that a jury could find a defamatory meaning in [defendant's] statement, and that a jury could find that the statement was of and concerning [plaintiff].")

ical public issues. Rhodes joined in just such a discussion in this instance. The general topic was the initiation and conduct of the war in Iraq; it included the United States government's use of contractors, including CACI, to perform certain military functions in the war effort; it also included the shocking abuses at Abu Ghraib and CACI's role there. Rhodes's criticism of CACI's role and conduct was unbridled, caustic, and indignant.

The actual malice "rule was prompted by a concern that, with respect to the criticism of public officials in their conduct of governmental affairs, a state-law rule compelling the critic of official conduct to guarantee the truth of all his factual assertions would deter protected speech." *Milkovich*, 497 U.S. at 14 (citations and internal quotation marks omitted). The conduct of the military and its designated civilian surrogates during wartime is a matter of the highest public concern, and speech critical of those responsible for military operations is well within "the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966); *see also id.* ("Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized."); *New York Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("[I]t is perhaps here[, in the areas of national defense and international affairs,] that a press that is alert, aware, and free most vitally serves the basic purpose of the First Amendment. For without an informed and free press there cannot be an enlightened people."); *United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson, J., concurring) ("National security is public security, not government security from informed criticism. No decisions are more serious than those touching on peace and war; none are more certain to affect every member of society."). The actual malice standard thus offers broad protection for the media commentator who is critical of public officials or public figures responsible for war-related activities. Such a commentator must simply "maintain[ ] a standard of care such as to avoid knowing falsehood or reckless disregard of the truth." *Time, Inc. v. Pape*, 401 U.S. 279, 291 (1971).

The district court determined "that CACI is a public figure because of [its] prominent role in the circumstances surrounding the events that occurred at Abu Ghraib — an issue of grave public concern." J.A. 1091-92. CACI does not contest its status as a public figure. CACI

became a public figure because the U.S. Army's military intelligence branch was woefully short of interrogators and engaged CACI to provide civilian interrogators at Abu Ghraib. CACI surely knew when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism — criticism that could be emboldened by the actual malice standard. *See Gertz*, 418 U.S. at 345 (stating that "the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood"); *Hatfill v. New York Times Co.*, ___ F.3d ___, ___, No. 07-1124, slip op. at 8 (4th Cir. Jul. 14, 2008) (same). After the shocking pictures of the Abu Ghraib abuses were broadcast on *60 Minutes II* in April 2004, and even more shocking revelations followed, CACI became a prime target of media criticism and comment. As the district court aptly noted, "[h]eads of states, public officials, media sources, academics, and individuals throughout the world took note of, and commented on, the events at the Abu Ghraib prison," where CACI played a prominent role. J.A. 1092.

A.

We first turn to CACI's claim that Rhodes defamed it by making statements on her show that its employees misrepresented their authority to soldiers at Abu Ghraib. In statement 2 on August 11, 2005, Rhodes said: "[L]ow level specialists . . . testified that they believed they were working for their government, and really they were working for CACI and Titan, as tools." J.A. 182. In statement 6 on August 24 Rhodes indicated that contractor employees misrepresented their authority to "our kids" (soldiers) and ordered "some of the really sick, twisted stuff" at Abu Ghraib. J.A. 208. In statement 7 on August 24 Rhodes said: "[I]t was obviously the contractors who . . . misrepresented to our kids who they were and what they were ordered to do." J.A. 209. In statement 9 on August 25 Rhodes said: "The President let those contractors go in there [at Abu Ghraib], and he let those contractors lie to our kids, and those kids believed that those contractors were military intelligence units, that they were CIA. But they weren't. They weren't. They were employees of CACI and Titan." J.A. 214. Moments later in statement 10, while discussing the role of CACI and Titan employees at Abu Ghraib, Rhodes continued:

"[T]hey wore military uniforms, too, these contractors. They literally impersonated officers." J.A. 218.

The district court concluded that the Fay/Jones and Taguba reports "gave Ms. Rhodes reasonable grounds to make claims that CACI employees either directed United States military personnel or acted in the capacity of United States personnel when directing military personnel." J.A. 1101. Therefore, the district court concluded that Rhodes's statements about CACI employees misrepresenting their authority and inappropriately assuming positions of authority were not made with actual malice. We conclude that the two military reports, together with other sources, support the district court's determination.

Brigadier General Karpinski, in her interview, insisted that "volumes of documents and information" confirmed that the soldiers implicated in the Abu Ghraib abuses were acting on the orders of both military intelligence personnel and contract interrogators. J.A. 290. The *Guardian* newspaper reported that some of the soldiers accused of abuse at Abu Ghraib "claimed to be acting in part under the instruction of" contract interrogators. J.A. 339. The Fay/Jones report found that contractors were supervising soldiers and vice versa and that the contractors' presence was "a complicating factor with respect to command and control" at Abu Ghraib. J.A. 598. This finding was supported by a prison organizational chart showing a CACI employee as head of the Detainee Assessment Branch at Abu Ghraib, with soldiers as his subordinates. Similarly, Seymour Hersh, the investigative journalist, reported that military police had abdicated the day-to-day management of detainees to military intelligence and contractor personnel. The Taguba report found that contractors wore military (desert camouflage) uniforms, which "cause[d] confusion and may have contributed to the difficulties in the accountability process." J.A. 503. Further, the Taguba report accused CACI employee Stephanowicz of allowing or instructing soldiers to use interrogation techniques that were "neither authorized [nor] in accordance with applicable regulations/policy," J.A. 519, and of bearing responsibility for the abuses. In sum, as the district court concluded, Rhodes's sources revealed that CACI employees inappropriately assumed positions of authority over, and gave orders to, soldiers.

CACI contends that the fact that its employees issued instructions to soldiers is irrelevant. Rather, CACI argues that Rhodes's sources gave her "no basis whatsoever for accusing CACI employees" of misrepresenting their authority to soldiers or impersonating officers in the sense that they wore military uniforms while they supervised soldiers. Appellants' Br. 51. CACI is simply wrong. Rhodes's sources are susceptible to at least two rational interpretations with respect to the misrepresentation of authority issue; and a speaker or publisher may adopt "one of a number of possible rational interpretations of [sources] that [contain] ambiguities" without creating a jury issue of actual malice. *Pape*, 401 U.S. at 290. It would be rational to interpret Rhodes's sources to suggest simply that soldiers took orders from CACI employees knowing they were contractors. On the other hand, it would be equally, if not more, rational to read the sources to suggest that CACI employees were misrepresenting their authority to soldiers. For example, the two army reports indicated that CACI employees had inserted themselves into the chain of command by giving orders to soldiers and, by wearing military uniforms, had caused confusion that led to difficulties in chain-of-command accountability. It was rational for Rhodes to interpret these reports to be saying that the contractors had *no* legitimate authority in the chain of command and that the contractor employees who gave orders to soldiers both overstepped *and misrepresented* their authority. Accordingly, Rhodes did not speak with reckless disregard for the truth when she accused CACI employees of misrepresenting their authority to soldiers.

### B.

On August 10, 2005, while speaking on her show about the treatment of Iraqi detainees at Abu Ghraib, Rhodes said in statement 1: "[T]he people that are torturing . . . are not our troops but it's CACI and Titan." J.A. 176. The district court, in considering this statement, held that there was sufficient information in Rhodes's sources to prevent CACI from establishing that she spoke with actual malice. According to the court, CACI could not establish that Rhodes "recklessly disregarded the truth when alleging that CACI employees had tortured Iraqi detainees." J.A. 1102. We agree.

Rhodes maintains that she used the word "torture" in statement 1 to describe the severe abuse that CACI bore responsibility for at Abu

Ghraib, according to her sources. CACI argues that abuse is not a synonym for torture and that Rhodes must be held to have accused CACI of torture in the sense that word is used in the U.S. criminal code. The code defines torture as an act "specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions)." 18 U.S.C. § 2340(1). However, the dictionary definitions of torture range from "any severe physical or mental pain," *Webster's New World College Dictionary* 1512 (4th ed. 2004), to "TORMENT" or "an extreme annoyance or severe irritation," *Webster's Third New International Dictionary* 2414 (2002). We conclude that a reasonable listener would have understood that Rhodes was not using the word "torture" in any narrow, legalistic sense, but in a broader sense that encompassed the range of severe abuses at Abu Ghraib that had been reported in the media and other sources through photographs and narrative descriptions. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515 (1991) (noting that a court considers "the meaning a statement conveys to a reasonable reader").

Rhodes relied on several reliable sources in accusing CACI of torture at the Abu Ghraib prison. The author of the Taguba report, commissioned by the U.S. Army, strongly suspected that CACI employee Stephanowicz was one of four individuals who "were either directly or indirectly responsible for the abuses at Abu Ghraib." J.A. 519. The Taguba report went beyond suspicion to *find* that Stephanowicz was responsible for abuse when he "[a]llowed and/or instructed MPs . . . to facilitate interrogations by 'setting conditions' which were neither authorized [nor] in accordance with applicable regulations/policy." J.A. 519. The report found specifically that Stephanowicz "*clearly knew* his instructions [to MPs to 'set conditions'] equated to physical abuse." J.A. 519 (emphasis added). The physical abuse documented by the Taguba report included punching and kicking detainees; pouring phosphoric liquid on detainees; sodomizing a detainee with a chemical light and perhaps a broomstick; allowing a military dog to bite a detainee; stacking naked male detainees, handcuffed and shackled, in piles; and forcibly requiring male detainees to participate in group masturbation. In sum, the Taguba report found that "numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees." J.A. 495.

Rhodes also relied on the Fay/Jones report, another report commissioned by the U.S. Army. The Fay/Jones report found abuse at Abu Ghraib that was inhumane, sadistic, coercive without lawful justification, or a "violat[ion of] U.S. criminal law." J.A. 545. The abuse was inflicted "by a small group of morally corrupt soldiers and civilians" employed by CACI and Titan, according to the report. J.A. 527. The Fay/Jones report detailed forty-four incidents of abuse at Abu Ghraib, finding that CACI employees were involved in nine. Among the nine incidents, a CACI interrogator attempted to coerce information from a detainee by enlisting an MP who prevented the detainee from breathing for a short time and twisted the detainee's arm into a painful position, using a nightstick; a CACI employee interrogated a detainee who was forced into an unauthorized stress position (squatting on a chair); and a CACI employee used unmuzzled military dogs to facilitate interrogations. The Fay/Jones report recommended that its findings with respect to three CACI employees be forwarded to the Army General Counsel for potential referral to the Department of Justice for prosecution. Finally, Fay/Jones reported that the International Committee of the Red Cross, which visited Abu Ghraib, noted that many detainees "suspected [of] security offenses or deemed to have intelligence value" were "subjected to . . . both physical and psychological coercion (*which in some cases was tantamount to torture*) in order to force cooperation with their interrogators." J.A. 622 (emphasis added; internal quotation marks omitted).

Rhodes also relied on another organization's published interview with Brigadier General Janis Karpinski who was in charge of Abu Ghraib when the abuses occurred. Karpinski had "no doubt in [her] mind that" the civilian contractors, CACI and Titan, "ordered" the abuses at Abu Ghraib. J.A. 298. According to Karpinski, the civilian contractors were "irresponsible and non-accountable people" who used Abu Ghraib as "a playground," and they "g[o]t out of control." *Id.* In addition to the official army reports and the Karpinski interview, reputable press reports, which Rhodes followed, indicated that civilian contractors bore significant responsibility for the abuses at Abu Ghraib.

Many of the abuses described above could reasonably be characterized as causing "severe physical or mental pain." *Webster's New World College Dictionary* 1512. And, in light of the extensive infor-

mation that Rhodes relied on with respect to CACI's role and conduct at Abu Ghraib, we conclude that CACI has not proffered clear and convincing evidence that Rhodes spoke with actual malice when she accused CACI of torturing detainees at the prison. *See Carr v. Forbes, Inc.*, 259 F.3d at 283. In sum, the record establishes that Rhodes did not make any statement that CACI committed torture with reckless disregard as to whether the statement was false or not. *See New York Times*, 376 U.S. at 280.

C.

In statement 1 Rhodes also referred to rape at Abu Ghraib, saying, "the people that are . . . raping," that is, "the ones that are being paid to do this are not our troops but it's CACI and Titan." J.A. 176. The district court determined that Rhodes's sources provided sufficient support for this statement to preclude a finding that Rhodes spoke with reckless disregard for the truth. We agree.

The Taguba and Fay/Jones reports and Brigadier General Karpinski concluded that CACI employees bore a substantial measure of responsibility for the abuses at Abu Ghraib. Both the Taguba and Fay/Jones reports listed rape and forced sodomy as among the atrocities committed against detainees. A U.S. Senator who viewed the non-public photographs and videos of Abu Ghraib abuses said that they contained scenes of rape and murder. The *Guardian* reported that a civilian contractor had been accused of raping a young male detainee. The rape of a teenage male detainee by a civilian contractor is also discussed in the Fay/Jones report, which mentions a Titan employee as a likely suspect. The Taguba report found that a male detainee was sodomized with a chemical light and perhaps a broomstick. The sources did not connect any CACI employee to any specific incident of rape or sodomy. Nevertheless, the Taguba report found that CACI employee Stephanowicz was responsible for encouraging abuse at Abu Ghraib and was likely responsible, along with three others, for the entire pattern of abuse at the prison — abuse that included rape and sodomy. Moreover, several sources reported that CACI employees assumed a supervisory role at the prison, and at least some CACI employees had a propensity to abuse or encourage soldiers to abuse detainees. In light of the information available to Rhodes, we

conclude that CACI cannot prove that her statement that CACI was responsible for rape was made with reckless disregard for the truth.

D.

In certain statements Rhodes accused CACI of responsibility for the rape (or torture) of children at Abu Ghraib. In statement 1 on August 10, 2005, during a discussion of the Abu Ghraib abuses, Rhodes said: "And the same independent contractors are doing the same grotesque things to little boys and girls now that we said Saddam was . . . ." J.A. 177. In statement 2 on August 11, Rhodes asked: "How about the defense contractors or the oil conglomerates or CACI or Titan International? . . . [W]hy are they allowed to torture and rape little children using low-level [military] clerks, who then go to jail for 10 or 15 years?" J.A. 181-82. In statement 11 on August 25, after discussing the Karpinski interview and the role of CACI and Titan at Abu Ghraib, Rhodes said: "They [the Iraqi people] say that the raping of their children and the raping of their children in front of them is no different than Saddam. It's incredible. . . [S]he [Karpinski] explains how this went and . . . how they did it and that they were paid in cash, these contractors . . . ." J.A. 219.

Rhodes's accusation about child rape has two components: that children were raped at Abu Ghraib and that CACI bore responsibility for the rape. Rhodes's sources provide support for each component of the accusation. With respect to child rape at Abu Ghraib, an article in the *Guardian* discussed a civilian contractor's rape of a male detainee who was in his mid-teens, and the Fay/Jones report included allegations of the rape of a male detainee aged fifteen to eighteen by a civilian, who partially matched the description of a Titan interpreter. (These reports may involve the same incident.) In addition, during a speech to the ACLU, investigative journalist Seymour Hersh, in discussing theretofore undisclosed atrocities at Abu Ghraib, said:

> Some of the worst things that happened that you don't know about. . . . And basically what happened is that those women [detained at Abu Ghraib] who were arrested with young boys, children, in cases that have been [video] recorded, the boys were sodomized, with the cameras rolling, and the

worst above all of them is the soundtrack of the boys shriek-
ing.

J.A. 331 (final alteration in original).

Rhodes's assignment of blame to CACI (and Titan) for the rape of
children at Abu Ghraib begins with her reliance on several sources,
the Taguba and Fay/Jones reports and the Karpinski interview, all of
which indicate a collapse of order at Abu Ghraib. These sources sug-
gest that CACI contributed to this collapse when its employees
improperly assumed supervisory roles and encouraged or instructed
MPs to abuse detainees.[3] Major General Taguba stated his belief that
CACI employee Stephanowicz was "directly or indirectly responsi-
ble" for "the horrific abuses suffered by the detainees at Abu Ghraib."
J.A. 519, 520. These abuses would surely include the rape of children.

We are quite mindful that the accusation that a government con-
tractor, or indeed any public figure, bears responsibility for child rape
is a grave one. The First Amendment, however, bars liability for such
a defamatory accusation absent clear and convincing proof that the
speaker made the accusation "with reckless disregard of whether it
was false or not." *New York Times*, 376 U.S. at 280. The Supreme
Court has made "clear that reckless conduct is not measured by
whether a reasonably prudent [person] would have published [or spo-
ken], or would have investigated before publishing [or speaking]." *St.
Amant v. Thompson*, 390 U.S. 727, 731 (1968). Instead, there must be
sufficient evidence to permit the conclusion that the defamatory state-
ment was "made with [a] high degree of awareness of [its] probable

---

[3]In statement 10 on August 25, 2005, Rhodes, in discussing CACI's
and Titan's roles in the breakdown of order at Abu Ghraib prison, said:
"[A]nd at night, the little mice would *play*, and they would *play* rape the
boys, and rape the girls, and pile them high . . . ." J.A. 218 (emphasis
added). This is an obvious reference to the widely-released photographs
of naked, abused detainees stacked in piles or human pyramids. The exis-
tence of more such photographs was confirmed in the Fay/Jones report.
J.A. 630 (describing an incident, depicted in six photographs, where
detainees "were stripped of their clothing, handcuffed together nude,
placed on the ground, and forced to lie on each other and simulate sex
while photographs were taken").

falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Again, Rhodes relied on several sources for the child rape allegation. Of course, "simple reliance upon someone else's statement does not absolve an author or publisher of liability. Recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Fitzgerald v. Penthouse Int'l*, 691 F.2d 666, 670 (4th Cir. 1982) (internal quotation marks omitted). Rhodes relied on the Hersh speech, the Fay/Jones report, and the *Guardian* article for her statement that the rape of children (or juveniles) occurred at Abu Ghraib. She relied on the Taguba report and Brigadier General Karpinski's interview for the point that CACI bore general responsibility for the horrific abuses at Abu Ghraib, abuses that would include the rape of children. There is no evidence to suggest that these sources provided unreliable information or that Rhodes had "obvious reasons" to doubt what they said. *See Fitzgerald*, 691 F.2d at 670. Accordingly, we conclude that a reasonable jury could not find that Rhodes spoke with reckless disregard for the truth when she accused CACI of responsibility for the rape of children.

IV.

Several of Rhodes's statements that CACI challenges as defamatory are not actionable because they do not assert actual facts about CACI. As we noted above, the First Amendment protects statements "that cannot reasonably [be] interpreted as stating actual facts about an individual" or entity. *Milkovich*, 497 U.S. at 20 (alteration in original; citation and internal quotation marks omitted). This category of protection allows for rhetorical hyperbole and other types of imaginative or exaggerated expression. *See id.*

A.

In several statements Rhodes, with free use of hyperbole and exaggeration, criticized the extensive use of U.S. military contractors in Iraq, saying that their employees could kill without being held to account. In statement 3 on August 15, 2005, Rhodes said:

> No one dared talk about the mercenaries. No one dared talk about all these companies, Blackwater, and CACI, and Titan, and now this new one, Three Canopies, that really

didn't even exist until this was started. And then they got this idea, hey let's get a Department of Defense contract and we'll send killers over there.

J.A. 193-94. In statement 4 on August 22, in the context of a conversation about military recruitment, Rhodes said:

But what's sickening is if you're a mercenary, if you go to work for Triple Canopy or you go to work for Blackwater, first of all, there's no laws. You'll never, ever, ever be court-martialed. You can do any damn thing you want to, including torture people. You can do a free-fire zone situation where you shoot at anybody you want to. . . . You can do whatever you want. . . . So for those people that just want to kill for the sake of killing . . . call Triple Canopy or call Blackwater or call CACI and Titan, especially if you want to torture people, and never have to come under the long arm of the law. I mean, that's how you get away with murder. . . . [Y]ou've got these fricken mercenaries over there just going crazy. And there's like 30,000 of them. And there's about 80,000 of them, but 30- to 40,000 of them are armed to the teeth and will kill you.

J.A. 202-03. In statement 10 on August 25, while discussing the Karpinski interview, Rhodes said: "[A]ll she [Karpinski] kept hearing from the people in Iraq is this deteriorated into contractor heaven. Mercenaries all over the country, killing people." J.A. 217. According to Rhodes, Karpinski "said it was a deadly mix [at Abu Ghraib] because [CACI and Titan] had no training in being interrogators." *Id.* In statement 13 on August 26, Rhodes spoke with a caller named David:

Rhodes:  You know you've got guys over there making, what, three thousand dollars a week, three hundred dollars a day.

David:  Yeah the contractors.

Rhodes:  Yeah, don't call them contractors, call them what they are, they're hired killers, they're mercenaries.

David:     Hired killers, yeah.

Rhodes:   Yeah, they're hired killers.

David:     Hired killers from Halliburton.

Rhodes:   They're from everywhere, they're from DynCorp and CACI and Titan in the prisons, and then you've got Triple Canopy and Blackwater.

J.A. 225-26.

In statement 3 Rhodes says that contractors (such as CACI), in contemplating work in Iraq, expected to "send killers over there." J.A. 194. Here, Rhodes was offering a permissible hyperbolic characterization of the work contractors would perform in Iraq, using tough, aggressive individuals who might be required to use lethal force. In statement 4 Rhodes suggests — tongue in cheek — that anyone wishing to torture, kill, or murder should go to work for one of the contractors such as Triple Canopy, Blackwater, CACI, or Titan. "[T]hese freakin' mercenaries," she said, were "armed to the teeth and will kill you," and "can do whatever [they] want" and "*never have to come under the long arm of the law*." J.A. 202-03 (emphasis added). Here, Rhodes was using hyperbole and exaggeration to make the point, which was well supported by her sources (including the Singer law review article), that current laws are ineffective in regulating military contractors operating abroad.

The district court concluded that Rhodes's characterizations of Iraq as having "deteriorated into contractor heaven" with "[m]ercenaries all over the country, killing people" (statement 10), J.A. 217, and characterizing a list of contractors, including CACI, as "hired killers" (statement 13), J.A. 225, were "quintessential examples of non-actionable rhetorical hyperbole." J.A. 1109. These statements are protected, the court concluded, because they "make[ ] clear to all reasonable listeners that [they] are offered . . . not as fact[s]," J.A. 1109-10, but as exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq.

We agree with the district court and conclude that nothing high-lighted above from statements 3, 4, 10, or 13 supports a claim for def-amation by CACI.

B.

CACI contends that Rhodes accused it of fighting on the side of apartheid and Mobutu, the former dictator in Zaire. On two occasions, in denouncing the use of contractors in Iraq, Rhodes mentioned that some *individuals* now working for contractors in Iraq had fought on the side of the apartheid and Mobutu regimes. In statement 3 on August 15, 2005, while discussing the *New York Times Magazine* arti-cle on the use of military contractors in Iraq and earlier conflicts, Rhodes said:

> No one dared talk about all these companies, Blackwater, and CACI, and Titan, and now this new one, Three Cano-pies, that really didn't even exist until this was started. . . . And these people . . . . They're not loyal to America. They're loyal to the corporation. And they have fought on the side of Apartheid . . . . These guys literally fought on the side of Mobutu who used to chop peop—, little children's hands off. . . . And these same guys, same people, that are making up these mercenary companies, same ones, are now over in Iraq doing whatever.

J.A. 193-94. In statement 12 on August 26, Rhodes repeated her point:

> I'm for getting the mercenaries who are making $3,000 a week out of there, who are not loyal . . . to this country, don't care a thing about democracy, they care about the bottom-line of Triple Canopy or Blackwater or CACI or Titan or DynCorp, and they are some of the most notori-ously evil people, and they are getting paid with our tax dol-lars. These are guys . . . they would find on the side of the government in South Africa that wanted to keep apartheid. They fought on the side of the government that was literally chopping off young boys' hands because they didn't want to kill them. They wanted them to be handless as little

reminders to everybody, that if you stood up to this government, that's what's going to happen to you, and they were like walking billboards for tyranny, for treachery, for murder!

J.A. 235-36.

The district court concluded that these statements were "immune from defamation liability" because the reasonable listener would understand that they were not stating actual facts about CACI itself. J.A. 1104. We agree. First, when Rhodes speaks of "these people" or "guys" having fought on the side of apartheid or Mobutu, she is referring to certain *individuals* currently employed by the contractors, not the contractors themselves. (The *New York Times Magazine* article referenced by Rhodes reported that some military contractors operating today "draw from South African veterans of the wars to save apartheid" and that one contractor considered providing help to Mobutu Sese Seko, the tyrannical dictator of Zaire. J.A. 353.) Rhodes did not accuse CACI in its corporate capacity of fighting on behalf of apartheid or Mobutu. Second, Rhodes's purpose in making statements 3 and 12 was to advance a strong and vivid argument that the U.S. government should not use military contractors in Iraq. Rhodes pressed her case against the use of military contractors by characterizing in loose and hyperbolic terms what individual mercenary soldiers and their allies had done in earlier times. Rhodes's statements, however, "cannot reasonably [be] interpreted as stating actual facts about" CACI. *See Milkovich*, 497 U.S. at 20 (alteration in original; citation and internal quotation marks omitted). These statements do not support CACI's defamation claim.

## V.

We turn finally to three related statements that are appropriately analyzed under both the actual malice standard and the standard protecting statements that cannot reasonably be interpreted as stating actual facts about an individual or entity. In these statements, all made on August 24, 2005, Rhodes discussed the murder of inmates at Abu Ghraib. In statement 5 she said: "So there are more photos of Abu Ghraib . . . . [T]here are Congress people who have seen them and they are disgusted by them. There are videos. And, yes, they clearly

show . . . [the] murder of people who have been caught in these drag-nets in Iraq." J.A. 207. A few sentences later in statement 6, she con-tinued: "And now we have this documentary, photographic, videographic evidence of some of the really sick, twisted stuff that . . . was done and carried out, not by generals and not by military peo-ple but were [sic] ordered by people who work for private contractors, mercenaries if you will." J.A. 208. In statement 8 Rhodes finished her point, saying:

> Unless we actually apologize for these, unless we actually have a president of the United States who says—look what's been done here and I know who did it and this is who did it and it was CACI and it was Titan and it was Blackwater and it was Halliburton and it was Bechtel and it was Dyn-Corp. and it was this one and it was Triple [Canopy] —-*whoever it was*, and he actually says these people are going to be put on trial and they will be charged with murder. . . . Until and when and if that happens, the recruitment for Al Qaeda is going to surpass our recruitment capabilities here in the United States.

J.A. 209 (emphasis added).

   CACI contends that in these statements Rhodes states the "actual fact" that CACI committed murder at Abu Ghraib. The statements themselves refute this contention. To begin with, the statements urge the United States to apologize for "the really sick, twisted stuff" that occurred at Abu Ghraib and to identify any culprit among the private contractors that ordered soldiers to abuse detainees. J.A. 208. As the district court noted, the only time CACI was mentioned in the August 24 statement was when she called on the President to investigate and identify any responsible contractor — CACI, Titan, Blackwater, Hal-liburton, Bechtel, Triple Canopy, or "*whoever it was*" — and put the contractor on trial for murder. Rhodes simply provided an open-ended list of potential targets for investigation without assigning blame to any particular contractor. She reserved judgment and urged the Presi-dent to bring "whoever it was" — the responsible party or parties — to justice. Rhodes, under any reasonable interpretation of these state-ments, was not saying that CACI committed murder at Abu Ghraib.

Even if we assumed that Rhodes in these statements was suggesting that CACI was responsible for murder at Abu Ghraib, the statements would be, as the district court concluded, protected by the actual malice standard. First, Rhodes's sources reported the murder or death in suspicious circumstances of Abu Ghraib detainees. A U.S. Senator, after reviewing unpublished photographs in the possession of the U.S. Department of Defense, said that the photographs contained scenes of murder at Abu Ghraib. The Taguba report found that photographs had been taken of dead Iraqi detainees at Abu Ghraib, and several photographs of at least one dead (and beaten) detainee were actually released. One detainee, recently transferred to military custody at Abu Ghraib, was discovered in a shower stall dead, handcuffed, and hooded with a sandbag. The Taguba report and Brigadier General Karpinski concluded that CACI employees, among others, were responsible for the range of atrocities at Abu Ghraib, and certain of Rhodes's sources indicated that murder was among the atrocities committed. Accordingly, Rhodes would not have been speaking with reckless disregard for the truth if she had suggested that CACI was responsible for murder. In other words, she would not have been speaking with a "high degree of awareness of [the] probable falsity" of her statement. *See Garrison*, 379 U.S. at 74.

Accordingly, Rhodes's statements 5, 6, and 8 relating to murder at Abu Ghraib are protected by the First Amendment.[4]

---

[4]CACI argues that the district court erred in granting summary judgment with respect to some of Rhodes's statements on the alternative ground that they were not "demonstrably false." J.A. 1093, 1096. These are statements 1, 2, and 4 accusing CACI employees of torture at Abu Ghraib and statements 2, 6, 7, 9, and 10 accusing CACI employees of misrepresenting their authority to soldiers. CACI suggests that the district court, in saying that these statements were not "demonstrably false," meant that they were not provable as false. *See Milkovich*, 497 U.S. at 19 (noting that a statement must be "provable as false" to support a defamation claim against a media defendant). CACI then argues that the district court erred because its reasoning does not support a conclusion that the pertinent statements are not provable as false. Because the district court also concluded, as have we, that these same statements are protected by the actual malice standard, we have no need to consider whether the district court erred in concluding that they were not "demonstrably false."

### VI.

We have made a thorough and independent examination of the whole record, and we are satisfied that each of Rhodes's statements that CACI challenges as defamatory is protected by the First Amendment: either it was not made with reckless disregard for the truth or it did not state actual facts about CACI (it was rhetorical hyperbole, for example). This case reminds us that "[i]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public [issues], and this opportunity is to be afforded for vigorous advocacy" that may be caustic and even exaggerated. *New York Times*, 376 U.S. at 269 (citations and internal quotation marks omitted). This essential privilege minimizes the danger of self-censorship on the part of those who would criticize, thus allowing robust debate about the actions of public officials and public figures (including military contractors such as CACI) who are conducting the country's business.

For all of the reasons given, the district court's order granting summary judgment to Randi Rhodes and Air America Radio is

*AFFIRMED*.

DUNCAN, Circuit Judge, concurring in the judgment:

The medium of talk radio is one in which hyperbole and diatribe reign as the preferred tools of discourse. Such expression, though not infrequently caustic and offensive, nevertheless enjoys robust First Amendment protection. Because prevailing First Amendment jurisprudence imposes a particularly onerous burden on public figures seeking to challenge such expression, I am compelled to concur in the judgment affirming the district court's award of summary judgment to Rhodes.

I write separately for two reasons. The first is to emphasize my view that the appropriateness of summary judgment here is more reflective of the magnitude of CACI's burden than the defensibility of Rhodes's comments. The second, as elaborated below, is to explain why even the most egregious and ill-supported of Rhodes's

statements—those implicating CACI in the rape of children—while approaching the outer limits of First Amendment protection, are nevertheless protected expression.

In Rhodes's August 11, 2005 broadcast, when speaking of "the defense contractors or the oil conglomerates or CACI or Titan International," she asked, "[W]hy are they allowed to torture and rape little children using low-level clerks, who then go to jail for 10 or 15 years?" J.A. 182. This accusation is no mere hyperbole, nor is it susceptible to an allegorical interpretation. Instead, Rhodes unequivocally charged CACI employees (and others) with a crime that shocks the conscience. If false, the statement seems paradigmatically defamatory.

Overlaying and cabining state defamation laws, however, are the First Amendment's stringent protections of free discourse. As relevant here, the First Amendment disallows a public figure from "recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). For a plaintiff to prove "actual malice," he must prove that the defendant had a particular, subjective state of mind at the time the statements were made. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 n.6 (1974). Barring proof of actual knowledge of falsity, then, a plaintiff must show that the statement was made with "reckless disregard," or "with a high degree of awareness of . . . probable falsity." *Carr v. Forbes, Inc.*, 259 F.3d 273, 282 (4th Cir. 2001) (omission in original) (internal quotations omitted).

Moreover, the proof of actual malice must take the form of clear and convincing evidence, and a public figure may not wait until the trial to submit such evidence. Indeed, "where the factual dispute [in a defamation action] concerns actual malice, . . . the appropriate *summary judgment question* will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice *by clear and convincing evidence* or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986) (emphasis added).

The evidence in the record suggests, at most, attenuated support for Rhodes's accusation that CACI was involved in child rape. Two sources available to Rhodes at the time she levied the charge against CACI—the *Guardian* article and the Fay/Jones report—credibly recount the rape of a teenager by a contractor at Abu Ghraib, but neither source specifically links CACI to that crime, nor does Rhodes point to any other source that does so. Similarly, the Taguba report found that CACI employee Stephanowicz shared substantial responsibility for much of the abuse at Abu Ghraib, but it did not allude to his involvement in the specific child-rape incident. Combined, these sources hardly prove CACI's liability for child rape.

But CACI must do more than prove the insufficiency of the evidence to support Rhodes's statement. To survive summary judgment, CACI must have forecast clear and convincing evidence that Rhodes made the statement with a high degree of subjective awareness of its probable falsity. In light of the evidence suggesting CACI's involvement in other abuses at Abu Ghraib and the credible sources identifying a contractor as the perpetrator of the child rape, the record does not support a finding, by clear and convincing evidence, that Rhodes levied the accusation recklessly. It is the absence of sufficient evidence of Rhodes's state of mind, and not any testament to the actual veracity or justifiability of her statement, that makes summary judgment appropriate here.

For these reasons, I concur in the judgment.