Certiorari granted, March 8, 2010
Affirmed by Supreme Court, March 2, 2011

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALBERT SNYDER,

        *Plaintiff-Appellee,*

    v.

FRED W. PHELPS, SR.; WESTBORO
BAPTIST CHURCH, INCORPORATED;
REBEKAH A. PHELPS-DAVIS; SHIRLEY
L. PHELPS-ROPER,

        *Defendants-Appellants,*

    and

JANE DOE; JOHN DOE, JR.,

        *Defendants.*

    No. 08-1026

THOMAS JEFFERSON CENTER FOR THE
PROTECTION OF FREE EXPRESSION;
AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES
UNION OF MARYLAND,

    *Amici Supporting Appellants,*

    and

JEFFREY IRA SHULMAN,

    *Amicus Supporting Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:06-cv-01389-RDB)

Argued: December 2, 2008

Decided: September 24, 2009

Before KING, SHEDD, and DUNCAN, Circuit Judges.

Judgment reversed and bonds discharged by published opinion. Judge King wrote the opinion, in which Judge Duncan joined. Judge Shedd wrote a separate opinion concurring in the judgment.

## COUNSEL

**ARGUED**: Margie Jean Phelps, Topeka, Kansas, for Appellants. Sean E. Summers, BARLEY & SNYDER, L.L.C., York, Pennsylvania, for Appellee. **ON BRIEF:** Craig T. Trebilcock, SHUMAKER WILLIAMS, P.C., York, Pennsylvania, for Appellee. J. Joshua Wheeler, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION, Charlottesville, Virginia, for The Thomas Jefferson Center for the Protection of Free Expression, Amicus Supporting Appellants. Joel Kleinman, David Schur, Ranga Sourirajan, DICKSTEIN SHAPIRO, L.L.P., Washington, D.C., for American Civil Liberties Union and American Civil Liberties Union of Maryland; Steven R. Shapiro, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for American Civil Liberties Union; Deborah A. Jeon, ACLU FOUNDATION OF MARYLAND, Baltimore, Maryland, for American Civil Liberties Union of Maryland, Amici Supporting Appellants. Jeffrey I. Shulman, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., Amicus Supporting Appellee.

**OPINION**

KING, Circuit Judge:

In June 2006, Albert Snyder instituted this diversity action in the District of Maryland against Westboro Baptist Church, Incorporated (the "Church"), and several of its members (collectively, the "Defendants"). Snyder's lawsuit is predicated on two related events: a protest the Defendants conducted in Maryland near the funeral of Snyder's son Matthew (an enlisted Marine who tragically died in Iraq in March 2006), and a self-styled written "epic" (the "Epic") that the Defendants posted on the Internet several weeks after Matthew's funeral. Snyder's complaint alleged five state law tort claims, three of which are implicated in this appeal: invasion of privacy by intrusion upon seclusion, intentional infliction of emotional distress ("IIED"), and civil conspiracy. After a trial in October 2007, the jury found the Defendants liable for $2.9 million in compensatory damages and a total of $8 million in punitive damages. Although the district court remitted the aggregate punitive award to $2.1 million, it otherwise denied the post-trial motions. *See Snyder v. Phelps*, 533 F. Supp. 2d 567 (D. Md. 2008) (the "Post-Trial Opinion"). The Defendants have appealed, contending that the judgment contravenes the First Amendment of the Constitution. As explained below, we reverse on that basis.

I.

A.

The facts of this case as presented at trial are largely undisputed, and they are detailed in the district court's Post-Trial Opinion:

> On March 3, 2006, Marine Lance Corporal Matthew
> A. Snyder was killed in Iraq in the line of duty.
> Shortly thereafter, two United States Marines came

to the home of the Plaintiff, Albert Snyder, and told him that his son had died. As Matthew Snyder had lived in Westminster, Maryland, and graduated from Westminster High School, St. John's Catholic Church in Westminster was selected as the site for his funeral, which was scheduled for March 10, 2006. Obituary notices were placed in local newspapers providing notice of the time and location of the funeral.

Defendant Fred W. Phelps, Sr., founded Defendant Westboro Baptist Church, Inc. in Topeka, Kansas, in 1955. For fifty-two years, he has been the only pastor of the church, which has approximately sixty or seventy members, fifty of whom are his children, grandchildren, or in-laws. Among these family members are Defendants Shirley L. Phelps-Roper and Rebekah A. Phelps-Davis. There are approximately ten to twenty members of the church who are not related to Phelps by blood or marriage. According to the testimony of Defendants' expert, the members of this church practice a "fire and brimstone" fundamentalist religious faith. Among their religious beliefs is that God hates homosexuality and hates and punishes America for its tolerance of homosexuality, particularly in the United States military. Members of the church have increasingly picketed funerals to assert these beliefs. Defendants have also established a website identified as www.godhatesfags.com in order to publicize their religious viewpoint.

Defendants' testimony at trial established that their picketing efforts gained increased attention when they began to picket funerals of soldiers killed in recent years. Members of the Phelps family prepare signs at an on-site sign shop at their Kansas church to take with them in their travels. They also

utilize an on-site production facility to produce videos displayed on the church's website.

Phelps testified that members of the Westboro Baptist Church learned of Lance Cpl. Snyder's funeral and issued a news release on March 8, 2006, announcing that members of the Phelps family intended to come to Westminster, Maryland, and picket the funeral. On March 10, 2006, Phelps, his daughters Phelps-Roper and Phelps-Davis, and four of his grandchildren arrived in Westminster, Maryland, to picket Matthew Snyder's funeral. None of the Defendants ever met any members of the Snyder family.

Defendants' rationale was quite simple. They traveled to Matthew Snyder's funeral in order to publicize their message of God's hatred of America for its tolerance of homosexuality. In Plaintiff's eyes, Defendants turned the funeral for his son into a "media circus for their benefit." By notifying police officials in advance, Defendants recognized that there would be a reaction in the community. They carried signs which expressed general messages such as "God Hates the USA," "America is doomed," "Pope in hell," and "Fag troops." The signs also carried more specific messages, to wit: "You're going to hell," "God hates you," "Semper fi fags," and "Thank God for dead soldiers." Phelps testified that it was Defendants' "duty" to deliver the message "whether they want to hear it or not." Lance Cpl. Snyder's funeral was thus utilized by Defendants as the vehicle for this message.

It was undisputed at trial that Defendants complied with local ordinances and police directions with respect to being a certain distance from the church. Furthermore, it was established at trial that

Snyder did not actually see the signs until he saw a television program later that day with footage of the Phelps family at his son's funeral.

Defendants' utilization of Matthew Snyder's funeral to publicize their message continued after the actual funeral on March 10, 2006. After returning to Kansas, Phelps-Roper published an "epic" on the church's website, www.godhatesfags.com. In "The Burden of Marine Lance Cpl. Matthew Snyder," Phelps-Roper stated that Albert Snyder and his ex-wife "taught Matthew to defy his creator," "raised him for the devil," and "taught him that God was a liar." In the aftermath of his son's funeral, Snyder learned that there was reference to his son on the Internet after running a search on Google. Through the use of that search engine, he read Phelps-Roper's "epic" on the church's website.

*Snyder v. Phelps*, 533 F. Supp. 2d 567, 571-72 (D. Md. 2008) (internal citation omitted).[1]

## B.

### 1.

When Albert Snyder filed his complaint in June 2006, he sued Fred W. Phelps, Sr., and the Church, later adding its

---

[1]The Defendants have a substantial history of protesting at venues other than soldiers' funerals. For example, on the day of Matthew Snyder's funeral, they also protested in Annapolis at the Maryland State House and at the Naval Academy. The Defendants have also been involved in litigation throughout the country relating to their protests. *See, e.g.*, *Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008); *Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008). As a result of such activities, approximately forty states and the federal government have enacted legislation addressing funeral picketing. *See* Stephen R. McAllister, *Funeral Picketing Laws and Free Speech*, 55 U. Kan. L. Rev. 575, 576 (2007).

members Shirley L. Phelps-Roper and Rebekah A. Phelps-Davis as defendants. The complaint alleged five state law tort claims: defamation, intrusion upon seclusion, publicity given to private life, IIED, and civil conspiracy. The Defendants moved for summary judgment on those claims, contending, inter alia, that their challenged words "constitute[ ] expressions of opinion, which are not actionable." J.A. 239.[2] They asserted that their words "are clearly rhetorical, hypothetical, religious and laced with opinion," and that "it is impossible to prove or disprove these things, particularly given that doctrinal viewpoints drive the opinions." *Id.*

On October 15, 2007, the district court granted summary judgment to the Defendants on two of the five tort claims: defamation and publicity given to private life.[3] The court awarded summary judgment on the defamation claim because the Defendants' speech was "essentially . . . religious opinion" and "would not realistically tend to expose Snyder to public hatred or scorn." *Snyder*, 533 F. Supp. 2d at 572-73. On the publicity given to private life claim, the court awarded summary judgment because the Defendants had not made public any private information. In so ruling, the court explained that the Defendants had published only information gleaned from a newspaper obituary and that such publication would not be highly offensive to a reasonable person, because the information was already a matter of public record.

In October 2007, the parties proceeded to trial on the remaining three claims of the complaint: intrusion upon seclusion, IIED, and civil conspiracy. At trial, Snyder testified, "recount[ing] fond memories of his son . . . and the traumatic

---

[2]Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[3]Snyder has not cross-appealed the district court's summary judgment awards to the Defendants on his tort claims for defamation and publicity given to private life. Thus, whether the court erred in making those rulings is not implicated in this appeal.

news of his passing." *Snyder*, 533 F. Supp. 2d at 588. In its Post-Trial Opinion, the district court summarized Snyder's testimony:

> He described the severity of his emotional injury, stating that he is often tearful and angry, and that he becomes so sick to his stomach that he actually physically vomits. He testified that Defendants placed a "bug" in his head, such that he is unable to separate thoughts of his son from the [Defendants'] actions: "there are nights that I just, you know, I try to think of my son at times and every time I think of my son or pass his picture hanging on the wall or see the medals hanging on the wall that he received from the [M]arine [C]orps, I see those signs." He testified also that "I want so badly to remember all the good stuff and so far, I remember the good stuff, but it always turns into the bad."
>
> Plaintiff also testified as to the permanency of the emotional injury. He testified that "I think about the sign [i.e., Thank God for dead soldiers] every day of my life. . . . I see that sign when I lay in bed at nights. I [had] one chance to bury my son and they took the dignity away from it. I cannot re-bury my son. And for the rest of my life, I will remember what they did to me and it has tarnished the memory of my son's last hour on earth." He stated also that "somebody could have stabbed me in the arm or in the back and the wound would have healed. But I don't think this will heal."
>
> Throughout trial, Plaintiff demonstrated significant emotion, appearing visibly shaken and distressed, and was often reduced to tears. On occasion during the trial, Plaintiff requested and was granted leave from the courtroom to compose himself. The jury witnessed firsthand Plaintiff's anguish and the

> unresolved grief he harbors because of the failure to conduct a normal burial.

*Id.* at 588-89 (second and third alterations in original) (internal citations omitted).

Snyder called several expert witnesses to testify concerning the injuries the Defendants had caused him, including the worsening of his diabetes and severe depression. Snyder's treating physician confirmed that the Defendants' actions had exacerbated Snyder's depression, thereby preventing him from going through the normal grieving process. *See Snyder*, 533 F. Supp. 2d at 588. Snyder's psychologist testified "that the demonstration and the things that [Plaintiff] talked about [seeing] in the website . . . have made the depression worse and lengthened it." *Id.* (alterations in original).

During the summary judgment proceedings and the trial, the Defendants repeatedly contended that the First Amendment protects their actions.[4] In that regard, the district court recognized that certain signs carried by the Defendants — such as "America Is Doomed" and "God Hates America" — "express[ed] general points of view" that may have merited First Amendment protection. *Snyder*, 533 F. Supp. 2d at 578. But the court ruled that certain other signs — such as "Thank God for Dead Soldiers," "Semper Fi Fags," "You're Going to Hell," and "God Hates You" — created issues of fact for the jury because they "could be interpreted as being directed at the Snyder family." *Id.* Likewise, the court concluded that statements published in the Epic on the Church website "created similar issues to be addressed by the finder of fact." *Id.*

---

[4]The Free Speech Clause of the First Amendment specifically guarantees that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause applies to the various states as a result of the Fourteenth Amendment. *See Stromberg v. California*, 283 U.S. 359, 368 (1931).

At trial, the Defendants challenged the propriety of the proposed jury instructions regarding the First Amendment.[5] During a hearing on jury instructions, the Defendants specifically objected to Instruction No. 21, which provided in full as follows:

> The Defendants in this case claim that their actions were protected by the First Amendment of the United States Constitution, which provides that Congress shall make no law . . . prohibiting the free exercise [of religion]; or abridging the freedom of speech. The Defendants have a right under the First Amendment to engage in picketing, and to publish their religious message, no matter how much you may disagree with that message. The First Amendment applies to action at the state and local level through the Fourteenth Amendment.

> As a general matter, the fact that society may find speech offensive is not a sufficient reason for suppressing it. Speech that is called hateful, or speech that is unpopular, or speech with which you strongly disagree, may still be protected speech. The government, including the courts, can place reasonable time, place, and manner restrictions on how protected speech may be expressed. These restrictions must be narrowly tailored, and should balance the interests of all the people involved. Speech that is vulgar, offensive, and shocking . . . is not entitled to absolute constitutional protection under all circumstances.

> The United States Supreme Court has long recog-

---

[5]In objecting to a proposed instruction on the intrusion upon seclusion claim, the Defendants sought to limit the jury's consideration to three specific signs. The trial court, however, authorized the jury to consider all of the signs as well as the Epic.

nized that not all speech is of equal First Amendment protection. When speech gives rise to civil tort liability, the level of First Amendment protection varies depending on the nature and subject matter of the speech.

As to the particular subject matter of the speech, a distinction has been drawn between matters of public and private concern. Where the speech is directed at private people and matters of private concern, the Supreme Court has held that the First Amendment interest in protecting particular types of speech must be balanced against a state's interest in protecting its residents from wrongful injury. You must balance the Defendants' expression of religious belief with another citizen's right to privacy and his or her right to be free from intentional, reckless, or extreme and outrageous conduct causing him or her severe emotional distress. As I have previously indicated to you at the start of this case, you as the judges of the facts in this case must determine whether the Defendants' actions were directed specifically at the Snyder family. If you do so determine, you must then determine whether those actions would be highly offensive to a reasonable person, whether they were extreme and outrageous and whether these actions were so offensive and shocking as to not be entitled to First Amendment protection.

J.A. 3113-14 (alteration and omissions in original) (internal quotation marks omitted). In objecting to Instruction No. 21, the Defendants asserted that "the First Amendment has more of a heavy balance even in civil cases than just anybody not wanting to be offended." *Id.* at 2883. Phelps-Roper, who was defending herself on a pro se basis, further objected, stating: "I just want to say that . . . it has never been clear in the record or to me what of our words are actionable and . . . [the court has] not limited the evidence to those words that you would

say were directed to a specific family." *Id.* at 2884. The court overruled the objections to Instruction No. 21, observed that the constitutional issues were preserved, and gave the instruction to the jury.

2.

On October 31, 2007, the jury found for Snyder on the three tort claims, awarding him $2.9 million in compensatory damages and a total of $8 million in punitive damages. After the district court entered judgment on November 5, 2007, the Defendants filed post-trial motions seeking judgment as a matter of law, judgment notwithstanding the verdict, reconsideration and rehearing, a new trial, relief from judgment, and relief of law and equity. The district court denied each of these motions by its Post-Trial Opinion. The Defendants also moved for a remittitur, contending that the verdict was grossly excessive.

In its Post-Trial Opinion of February 4, 2008, the district court disposed of the Defendants' various legal challenges. The Post-Trial Opinion explained that this case "involves balancing [the Defendants' First Amendment rights of religious expression] with the rights of other private citizens to avoid being verbally assaulted by outrageous speech and comment during a time of bereavement." *Snyder*, 533 F. Supp. 2d at 579. As to the "content of the signs," the court was satisfied that it had "instructed the jury on the First Amendment, specifically the balance between Defendants' First Amendment rights and Maryland's interest in protecting its citizens," such that there "was sufficient evidence in the trial record for a reasonable jury to conclude that Defendants' conduct was so extreme and outrageous as to cause Plaintiff's injury." *Id.* at 581. The court also rejected the Defendants' post-trial contention that the court "should have held as a matter of law that [the Defendants] were entitled to First Amendment protection." *Id.* at 582. The court emphasized that it had permitted the jury to decide if the Defendants' conduct was sufficient to

hold them liable on the three Maryland tort claims, and the jury had found the Defendants liable. *See id.* at 580-82.

Finally, by its Post-Trial Opinion, the district court upheld the compensatory damages award but remitted the punitive damages award to a total of $2.1 million, resulting in an aggregate judgment of $5 million. The Defendants have now appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[6]

## II.

The Defendants' primary appellate contention is that the judgment contravenes the First Amendment. In addition to their First Amendment contentions, the Defendants raise the following other issues: that the district court lacked personal and subject matter jurisdiction; that Snyder had no privacy right in Matthew's funeral; that the punitive damages award contravenes due process; that the jury was impermissibly biased; that the district court made prejudicial evidentiary errors at trial; that the civil conspiracy verdict is inconsistent with state law; and that Maryland's statutory cap on compensatory damages applies to the damages award. We are content to reject each of these non-First Amendment contentions without further discussion because they are all plainly without merit.[7]

---

[6]Each of the Defendants requested a stay of execution of judgment pending appeal, which the district court conditionally granted. Phelps and the Church were then required to post property bonds, and Phelps-Roper and Phelps-Davis had to post substantial cash bonds. On May 19, 2008, we denied the requests of Phelps-Roper and Phelps-Davis to stay the judgment without bond pending appeal.

[7]The Defendants also assert on appeal that we improperly denied the requests of Phelps-Roper and Phelps-Davis to stay the judgment without bond pending appeal. As explained below, we discharge the various bonds as a corollary to reversing the judgment.

Notably, the Defendants do *not* challenge the sufficiency of the evidence, although an amicus brief seeks to raise that issue. Our good colleague Judge Shedd would reverse the judgment against the Defendants on the issue of evidence sufficiency that is asserted only by the amicus submission. In that respect, we agree that, although the Defendants properly raised the sufficiency issue in the district court, they have abandoned that contention on appeal. Thus, the Defendants and their counsel have exercised their discretion and voluntarily waived the sufficiency issue. Notwithstanding such waiver, however, Judge Shedd would reverse the judgment because he agrees with the amicus that the supporting evidence was insufficient.

We respectfully reject our good friend's reliance on the amicus contention, because the evidentiary issue has plainly been waived by the only party entitled to pursue it. As a result, the First Amendment contention must be addressed. Put simply, our Court and our sister circuits have consistently been wary, even prohibitive, of addressing an issue raised solely by an amicus. *See United States v. Buculei*, 262 F.3d 322, 333 n.11 (4th Cir. 2001) ("'An issue waived by appellant cannot be raised by amicus curiae.'" (quoting *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991)); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (declining to address issue not raised in opening brief, as it would be "unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues" (internal quotation marks omitted)). Indeed, "'[a]n appellant and an amicus may not split up the issues and expect the court to consider that they have all been raised on appeal.'" *Buculei*, 262 F.3d at 333 n.11 (quoting *Amoco Oil Co. v. United States*, 234 F.3d 1374, 1378 (Fed. Cir. 2000)). *But see Spicer v. Hilton*, 618 F.2d 232, 240 (3d Cir. 1980) (concluding that constitutional issues should yield to nonconstitutional ones, even where nonconstitutional issues were not raised by parties). As the Federal Circuit has aptly described such a situation, "[i]t is the appellant's case, not a joint appeal by the appellant and

amicus. Appellant must raise in its opening brief all the issues it wishes the court to address." *Amoco Oil*, 234 F.3d at 1378.

On the other hand, we acknowledge that the Supreme Court has seen fit, in narrow and circumscribed circumstances of its own choosing, to address and dispose of an issue raised solely by an amicus. *See Teague v. Lane*, 489 U.S. 288, 300 (1989) (addressing retroactivity issue on appeal because "th[e] question is not foreign to the parties," who addressed retroactivity with respect to another claim); *see also Davis v. United States*, 512 U.S. 452, 457 n.* (1994) (recognizing that Supreme Court may assess contentions raised only in amicus brief, but declining to do so). With all respect to the Supreme Court's treatment of the waiver issue in *Teague* and *Davis*, this situation does not warrant an exception to our post-*Teague* circuit precedent.[8] Because the Defendants have voluntarily waived any contention that the evidence is insufficient to support the verdict, we are obligated to grapple with and resolve the First Amendment issues presented by the judgment.[9]

### III.

With respect to the First Amendment issue, the Defendants maintain that they were entitled to judgment as a matter of

---

[8]In this regard, we further observe that recognition of the right of an amicus to present an issue that the parties have no desire to further litigate would constitute judicial recognition of a lawyer relief rule — inviting lawyers and nonparties otherwise without standing to seek out and engage in mischief that would readily be likened to barratry, champerty, or maintenance.

[9]Because the sufficiency of the evidence issue was waived, the *Ashwander* principle — that a court should not "decide questions of a constitutional nature unless absolutely necessary" — is inapplicable here. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (internal quotation marks omitted). The resolution of the First Amendment issues is absolutely necessary, as it is the sole appropriate means for disposing of this appeal.

law because the First Amendment fully protects their speech at the Maryland protest and in the written Epic they published on the Internet. We will first address the Defendants' assertion that the court erroneously permitted the jury to decide legal issues reserved to the court. Such an error would garner the Defendants a new trial, but there is no need for a new trial if the Defendants were entitled to prevail under the First Amendment. Thus, after describing the general legal framework applicable here, we specifically address the application of that legal framework to the Defendants' various protest signs and their written Epic.

A.

It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 264-65 (1964).[10] Although the Supreme Court in *New York Times* specifically addressed the common law tort of defamation, the Court explained that its reasoning did not turn on the precise "form in which state power has been applied." *Id.* at 265. Accordingly, the Court later applied the First Amendment to other torts not involving reputational damages, *see Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53 (1988) (IIED), and we have applied the Court's controlling principles to other state law torts, *see Food Lion v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 511, 522 (4th Cir. 1999) (fraud, breach of duty of loyalty, and trespass). Thus, regardless of the specific tort being employed, the First Amendment applies when a plaintiff seeks damages for

---

[10]The district court properly distinguished these proceedings, where the Defendants contend that the First Amendment immunizes them from tort liability, from other decisions relied on by the Defendants addressing the constitutionality of *statutory* prohibitions affecting funeral pickets. *See Snyder v. Phelps*, 533 F. Supp. 2d 567, 578-79 (D. Md. 2008) (distinguishing certain "successful attacks by the [Defendants] upon *statutory* restrictions" that have not met constitutional muster).

reputational, mental, or emotional injury allegedly resulting from the defendant's speech. *See id.* at 523.[11]

Where, as here, the First Amendment is implicated by the assertion of tort claims arising from speech, we have the obligation "to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times*, 376 U.S. at 284-86); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (referring to the review required by *Bose Corp.* as "enhanced appellate review"). We review de novo a district court's conclusions of law with respect to a First Amendment issue. *See United States v. Bly*, 510 F.3d 453, 457 (4th Cir. 2007).

In its *New York Times* decision, the Supreme Court established a rule barring public officials from recovering damages for the common law tort of defamation unless the allegedly defamatory statement was made with "actual malice," and the Court defined such malice as knowing falsity or reckless disregard for the truth. 376 U.S. at 279-80. The Court later expanded that constitutional standard to speech concerning "public figures" as well as "public officials," *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring in the result), but stopped short of extending its protective rule to speech targeting private figures, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-46 (1974).

Nevertheless, in a distinct but related line of decisions, the

---

[11]The Supreme Court has deemed the First Amendment defense inapplicable to a state law tort claim only when the plaintiff seeks damages for actual pecuniary loss, as opposed to injury to reputation or state of mind. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991) (concluding that First Amendment did not bar economic damages resulting from defendant's tortious breach of promise).

Court has recognized that there are constitutional limits on the *type* of speech to which state tort liability may attach. *See Milkovich*, 497 U.S. at 16; *Hustler Magazine*, 485 U.S. at 50; *see also Deupree v. Iliff*, 860 F.2d 300, 304-05 (8th Cir. 1988) (recognizing that certain types of speech are protected regardless of plaintiff's status as private or public figure). Thus, although there is no categorical constitutional defense for statements of "opinion," the First Amendment will fully protect "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20 (alteration in original) (quoting *Hustler Magazine*, 485 U.S. at 50).[12]

In *Milkovich*, which is a crucial precedent in our disposition of this appeal, the Supreme Court declined to adopt an artificial dichotomy between "opinion" and "fact," and it specifically eschewed the multifactor tests that several lower courts (including this Court) had utilized to categorize speech. *See* 497 U.S. at 19; *see also Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183-84 (4th Cir. 1998) (explaining that *Milkovich* rejected our multifactor test). In *Milkovich*, the Court assessed whether a newspaper enjoyed First Amendment protection for a column that referred to a wrestling coach as a "liar," based on his allegedly deceitful testimony before a state athletics council. 497 U.S. at 4-5 & n.2. The newspaper maintained that the column merely stated its author's opinion, and was thus subject to categorical First Amendment protection. *Id.* at 17-18. The Court rejected this contention, ruling instead that the "dispositive question" was "whether a reasonable factfinder could conclude that the statements in the [newspaper] column imply an assertion that [the coach] perjured himself in a judicial proceeding." *Id.* at 21. Concluding that the column's assertions were "susceptible of being proved true or

---

[12]There is no suggestion that the speech at issue falls within one of the categorical exclusions from First Amendment protection, such as those for obscenity or "fighting words." *See, e.g.*, *Miller v. California*, 413 U.S. 15, 20 (1973); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942).

false," the Court determined that they were not protected by the First Amendment. *Id.*

In light of *Milkovich*, and as carefully explained by Judge Motz in our *Biospherics* decision, we are obliged to assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message. *See Biospherics*, 151 F.3d at 184. And we must emphasize the "verifiability of the statement," because a statement not subject to objective verification is not likely to assert actual facts. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.").

There are two subcategories of speech that cannot reasonably be interpreted as stating actual facts about an individual, and that thus constitute speech that is constitutionally protected. First, the First Amendment serves to protect statements on matters of public concern that fail to contain a "provably false factual connotation." *Milkovich*, 497 U.S. at 20.[13] We

---

[13]Neither the Supreme Court nor this Court has specifically addressed the question of whether the constitutional protections afforded to statements not provably false should apply with equal force to both media and nonmedia defendants. *See Milkovich*, 497 U.S. at 20 n.6. The Second and Eighth Circuits, however, have rejected any media/nonmedia distinction. *See Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000); *In re IBP Confidential Bus. Documents Litig.*, 797 F.2d 632, 642 (8th Cir. 1986); *see also Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1563 n.39 (4th Cir. 1994) (implying in dicta that *Milkovich* applies equally to media and nonmedia defendants). Like those two circuits, we believe that the First Amendment protects nonmedia speech on matters of public concern that does not contain provably false factual assertions. Any effort to justify a media/nonmedia distinction rests on unstable ground, given the difficulty of defining with precision who belongs to the "media."

assess as a matter of law whether challenged speech involves a matter of public concern by examining the content, form, and context of such speech, as revealed by the whole record. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 446 (4th Cir. 2004).[14] In order to be treated as speech involving a matter of public concern, the interested community need not be especially large nor the relevant concern of "paramount importance or national scope." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 132 (1st Cir. 1997).

Second, rhetorical statements employing "loose, figurative, or hyperbolic language" are entitled to First Amendment protection to ensure that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20-21. The general tenor of rhetorical speech, as well as the use of "loose, figurative, or hyperbolic language" sufficiently negates any impression that the speaker is asserting actual facts. *Id.* at 21; *see also Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974) (concluding that reference to worker who crossed picket line as "traitor" was not

And, more importantly, the Supreme Court has concluded that the "inherent worth of speech . . . does not depend upon the identity of its source, whether corporation, association, union, or individual." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978). Thus, for our purposes, the status of the Defendants as media or nonmedia is immaterial.

[14]In our *Kirby* decision, we assessed whether the words at issue involved a matter of public concern in the context of a public employment retaliation action. *See* 388 F.3d at 444. Both the Supreme Court and the courts of appeals have borrowed from that context for purposes of analyzing tort liability under the First Amendment. *See, e.g.*, *Dun & Bradstreet*, 472 U.S. at 759; *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 132 (1st Cir. 1997).

actionable); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (treating description of negotiating position as "blackmail" as epithet not conveying commission of actual crime). We assess as a matter of law whether speech contains rhetorical hyperbole protected by the First Amendment. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 294 (4th Cir. 2008).

We had occasion to apply these legal principles just last year in our *CACI* decision. *See* 536 F.3d at 293. CACI was a civilian defense contractor that performed interrogation services for the military at Abu Ghraib prison in Iraq. CACI claimed that it had been defamed by a talk radio host who had made on-air statements blaming CACI for the mistreatment of detainees at the prison and criticizing the use of wartime contractors in general. *See id.* at 288-92. Judge Michael's opinion affirmed the summary judgment award to the radio host, based in part on the determination that her statements were protected by the First Amendment because they "did not state actual facts about CACI." *Id.* at 304.[15]

The radio host, for example, had claimed that CACI and other defense contractors employed "[m]ercenaries all over the country, killing people," and she had characterized CACI and other contractors as "hired killers." *CACI*, 536 F.3d at 301 (alteration in original). Judge Michael explained that no reasonable listener would understand the challenged statements to assert actual facts about CACI, but rather would understand them as "exaggerated rhetoric intended to spark the debate about the wisdom of the use of contractors in Iraq." *Id.* at 301-02. The radio host had twice mentioned that certain individuals working for contractors in Iraq fought for apartheid in

---

[15]The *CACI* opinion also concluded that other statements made by the radio host were protected by the First Amendment because they were not made with "actual malice," as defined in the *New York Times* decision, i.e., those statements had not been made with knowing falsity or reckless disregard for the truth. *See CACI*, 536 F.3d at 294-300.

South Africa. *See id.* at 302. Those statements also could not reasonably be interpreted as stating actual facts about CACI: they were properly understood as referring to individual employees of the contractors, as opposed to the contractors themselves, and the host had simply used "loose and hyperbolic terms" to press her case against the government's use of military contractors. *Id.*

## B.

In this proceeding, Snyder was awarded judgment against the Defendants on three of the tort claims asserted in the Amended Complaint: intrusion upon seclusion, IIED, and civil conspiracy. By these claims, Snyder sought damages for injuries to his state of mind only, and not for pecuniary loss. Thus, the verdict in favor of Snyder can only be sustained if it is consistent with the Defendants' First Amendment guarantees. *See Food Lion*, 194 F.3d at 522 (foreclosing any attempt to recover damages under "non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim"). As explained below, the Defendants correctly contend that the district court erred in permitting the jury to decide legal issues reserved to the court, and then by denying the Defendants' request for judgment as a matter of law.

## 1.

Assuming that the district court otherwise applied the proper legal standards to its analysis of the Defendants' First Amendment contentions, it fatally erred by allowing the jury to decide relevant legal issues. Instruction No. 21, to which Defendants carefully objected at trial, explained to the jury that certain speech, including that which is "vulgar, offensive, and shocking," is not entitled to "absolute constitutional protection." J.A. 3113. It also explained that the protections accorded under the First Amendment vary with the "nature and subject matter of the speech," and the instruction sug-

gested that, when speech on matters of private concern is directed at private figures, the First Amendment "must be balanced against" the state's interest in protecting its citizens. *Id.* at 3114.

The district court thus decided that it was for the jury — not the court — to assess the preliminary issue of the nature of the speech involved, and to then decide whether such speech was protected by the Free Speech Clause. Thus, the jury was erroneously tasked with deciding whether the Defendants' speech was "directed specifically at the Snyder family," and, if so, whether it was so "offensive and shocking as to not be entitled to First Amendment protection." J.A. 3114; *see also id.* ("You must balance the Defendants' expression of religious belief with another citizen's right to privacy and his or her right to be free from intentional, reckless, or extreme and outrageous conduct causing him or her severe emotional distress."). At the least, therefore, the judgment must be vacated and a new trial awarded, in that Instruction No. 21 authorized the jury to determine a purely legal issue, namely, the scope of protection afforded to speech under the First Amendment.[16]

As previously noted, however, a new trial is unnecessary if the Defendants can prevail as a matter of law after our independent examination of the whole record. *See Milkovich*, 497 U.S. at 17. We are thus obliged to apply the applicable legal framework to the Defendants' various protest signs and writ-

---

[16]The Post-Trial Opinion confirms that the jury assessed legal issues that were reserved to the court. *See Snyder*, 533 F. Supp. 2d at 578 ("While signs expressing general points of view are afforded First Amendment protection, [certain] additional signs, which could be interpreted as being directed at the Snyder family, created issues for the finder of fact."). Thus, the district court permitted the jury to determine the nature of the speech (i.e., as containing assertions of actual fact specifically directed at and concerning the Snyders), and indicated that the jury should decide whether the signs should be afforded First Amendment protection.

ten Epic, and decide if the Defendants are entitled to judgment as a matter of law.

2.

The district court also erred when it utilized an incorrect legal standard in its Post-Trial Opinion. In assessing the Defendants' First Amendment contentions, the court focused almost exclusively on the Supreme Court's opinion in *Gertz*, which it read to limit the First Amendment's protections for "speech directed by private individuals against other private individuals." *Snyder v. Phelps*, 533 F. Supp. 2d 567, 577 (D. Md. 2008). The court therefore assessed whether Snyder was a "public figure" under *Gertz* and whether Matthew's funeral was a "public event." *See id.*[17]

The Supreme Court has created a separate line of First Amendment precedent that is specifically concerned with the constitutional protections afforded to certain *types* of speech, and that does not depend upon the public or private status of the speech's target. *See Milkovich*, 497 U.S. at 16; *Hustler Magazine*, 485 U.S. at 50. Thus, even if the district court (as opposed to the jury) concluded that Snyder and his son were not "public figures," such a conclusion alone did not dispose of the Defendants' First Amendment contentions. In focusing solely on the status of the Snyders and the funeral, and not on the legal issue concerning the nature of the speech at issue, the court failed to assess whether the pertinent statements could reasonably be interpreted as asserting "actual facts" about an individual, or whether they instead merely contained rhetorical hyperbole. *See Milkovich*, 497 U.S. at 20; *CACI*, 536 F.3d at 293. Whether a statement can reasonably be inter-

---

[17]The district court failed to distinguish between Snyder and his deceased son for purposes of the "public figure" analysis. *See Snyder*, 533 F. Supp. 2d at 577. Because the speech at issue cannot reasonably be interpreted as stating actual facts about *any* individual, we need not decide whether the court should have drawn a distinction.

preted as stating actual facts about an individual is a question of law for the court, *see CACI*, 546 F.3d at 293-94, and the district court failed to consider that issue in its Post-Trial Opinion. Consequently, we must assess the content of the Defendants' protest signs as well as the Epic, and determine whether such speech is entitled to constitutional protection.

a.

The following signs displayed by the Defendants, which are similar in both their message and syntax, can readily be assessed together: "America is Doomed," "God Hates the USA/Thank God for 9/11," "Pope in Hell," "Fag Troops," "Semper Fi Fags," "Thank God for Dead Soldiers," "Don't Pray for the USA," "Thank God for IEDs," "Priests Rape Boys," and "God Hates Fags."[18] As a threshold matter, as utterly distasteful as these signs are, they involve matters of public concern, including the issue of homosexuals in the military, the sex-abuse scandal within the Catholic Church, and the political and moral conduct of the United States and its citizens. Such issues are not subjects of "purely private concern," *Dun & Bradstreet*, 472 U.S. at 759, but rather are issues of social, political, or other interest to the community, *see, e.g.*, *Acanfora v. Bd. of Educ. of Montgomery County*, 491 F.2d 498, 500-01 (4th Cir. 1974) (holding that speech concerning homosexuality was matter of public concern). As explained in one of the amicus submissions, for example, a public firestorm erupted in 2001 after two prominent religious figures, Jerry Falwell and Pat Robertson, alleged that the September 11th terrorist attacks represented God's punishment for our country's attitudes regarding homosexuality and abor-

---

[18]The district court did not specifically discuss four of these signs ("Don't Pray for the USA," "Thank God for IEDs," "Priests Rape Boys," and "God Hates Fags") in its Post-Trial Opinion. It also did not mention other signs displayed at the funeral — those reading "Maryland Taliban," "Fags Doom Nations," and "Not Blessed Just Cursed" — that further support our conclusion that the signs contained generally directed rhetorical hyperbole, and not actual, provable facts about Snyder or his son.

tion. *See* John F. Harris, "God Gave U.S. 'What We Deserve,' Falwell Says," Wash. Post, Sept. 14, 2001, at C3.

Additionally, no reasonable reader could interpret any of these signs as asserting actual and objectively verifiable facts about Snyder or his son. The signs reading "God Hates the USA/Thank God for 9/11" and "Don't Pray for the USA," for example, are not concerned with any individual, but rather with the nation as a whole. Other signs (those referring to "fags," "troops," and "dead soldiers") use the plural form, which would lead a reasonable reader to conclude that the speaker is referring to a group rather than an individual. Additional signs are concerned with individuals, such as the Pope, who are entirely distinct from Snyder and his son, or with groups, such as priests, to which neither Snyder nor his son belong. Finally, those signs stating "Thank God for Dead Soldiers" and "Thank God for IEDs" only constitute a reference to Snyder's son if the reader makes the assumption that their only object is Matthew Snyder and not the thousands of other soldiers who have died in Iraq and Afghanistan, often as a result of IEDs.

Even if the language of these signs could reasonably be read to imply an assertion about Snyder or his son, the statements are protected by the Constitution for two additional reasons: they do not assert provable facts about an individual, and they clearly contain imaginative and hyperbolic rhetoric intended to spark debate about issues with which the Defendants are concerned. *See CACI*, 536 F.3d at 301. Whether "God hates" the United States or a particular group, or whether America is "doomed," are matters of purely subjective opinion that cannot be put to objective verification. The statement "Thank God," whether taken as an imperative phrase or an exclamatory expression, is similarly incapable of objective verification. And, as heretofore explained, a reasonable reader would not interpret the signs that could be perceived as including verifiable facts, such as "Fag Troops" and "Priests Rape Boys," as asserting actual facts *about* Snyder or

his son. To the contrary, these latter statements, as well as others in this category, consist of offensive and hyperbolic rhetoric designed to spark controversy and debate. By employing God, the strong verb "hate," and graphic references to terrorist attacks, the Defendants used the sort of "loose, figurative, or hyperbolic language" that seriously negates any impression that the speaker is asserting actual facts about an individual. *Milkovich*, 497 U.S. at 21. Accordingly, we are constrained to agree that these signs — "America is Doomed," "God Hates the USA/Thank God for 9/11," "Pope in Hell," "Fag Troops," "Semper Fi Fags," "Thank God for Dead Soldiers," "Don't Pray for the USA," "Thank God for IEDs," "Priests Rape Boys," and "God Hates Fags" — are entitled to First Amendment protection.

b.

The reasonable reader's reaction to two other signs — "You're Going to Hell" and "God Hates You" — also must be specifically addressed, as these two signs present a closer question. We must conclude, however, that these two signs cannot reasonably be interpreted as stating actual facts about any individual. The meaning of these signs is ambiguous because the pronoun "you" can be used to indicate either the second person singular or plural form.[19] A reasonable reader could interpret these signs, therefore, as referring to Snyder or his son only, or, on the other hand, to a collective audience (or even the nation as a whole).

We need not resolve this question of usage, however, because a reasonable reader would not interpret the statements on these two signs as asserting actual and provable facts. Whether an individual is "Going to Hell" or whether God approves of someone's character could not possibly be subject

---

[19]Historically, the pronoun "you" was used only in the plural form; the word "thou" was used to refer to a single person. *See Webster's Third New International Dictionary* 2380-81 (1976).

to objective verification. Thus, even if the reasonable reader understood the "you" in these signs to refer to Snyder or his son, no such reader would understand those statements ("You're Going to Hell" and "God Hates You") to assert provable facts about either of them.

Additionally, as with the other signs, both of these signs contain strong elements of rhetorical hyperbole and figurative expression. As we have recognized, the "context and tenor" of the speech at issue, as well as the speaker's use of "irreverent and indefinite language," can serve to negate any impression that he is asserting actual facts about an individual. *Biospherics*, 151 F.3d at 184-85. The general context of the speech in this proceeding is one of impassioned (and highly offensive) protest, with the speech at issue conveyed on hand-held placards. A distasteful protest sign regarding hotly debated matters of public concern, such as homosexuality or religion, is not the medium through which a reasonable reader would expect a speaker to communicate objectively verifiable facts. In addition, the words on these signs were rude, figurative, and incapable of being objectively proven or disproven. Given the context and tenor of these two signs, a reasonable reader would not interpret them as asserting actual facts about either Snyder or his son.

c.

Finally, the written Epic published on the website of the Church is also protected by the First Amendment, in that a reasonable reader would understand it to contain rhetorical hyperbole, and not actual, provable facts about Snyder and his son. The First Amendment issue concerning the Epic presents a somewhat more difficult question, however, because it is entitled "The Burden of Marine Lance Cpl. Matthew A. Snyder." J.A. 3788. Such a title could lead a reasonable reader to initially conclude that the Epic asserts facts about this particular soldier. The Epic's subtitle, however, immediately connects its contents to the Defendants' protest and the various

signs displayed there: "The Visit of Westboro Baptist Church to Help the Inhabitants of Maryland Connect the Dots! This Epic Adventure Took Place on Friday, March 10, 2006." *Id.* The Epic has a photograph of the funeral protest immediately below its title, followed by nearly two pages of verbatim Bible verses. *Id.* at 3788-89.

The Epic then discusses Matthew's life: "Twenty years ago, little Matthew Snyder came into the world. . . . God created him and loaned/entrusted him to Albert and Julie Snyder." J.A. 3790. The Epic states that the Snyders "had a DUTY to prepare that child to serve the LORD his GOD — PERIOD! You did JUST THE OPPOSITE — you raised him for the devil. You taught him that God was a liar." *Id.* at 3791. The Epic also focuses on Matthew's upbringing, asserting that "Albert and Julie . . . taught Matthew to defy his Creator, to divorce, and to commit adultery. They taught him how to support the largest pedophile machine in the history of the entire world, the Roman Catholic monstrosity. . . . They also, in supporting satanic Catholicism, taught Matthew to be an idolater." *Id.* After interspersing additional excerpts from the Bible, the Epic refers to Matthew's service in the military, noting that he fought for

> the United States of Sodom, a filthy country that is in lock step with his evil, wicked[,] and sinful manner of life, putting him in the cross hairs of a God that is so mad He has smoke coming from his nostrils and fire from his mouth! How dumb was that?

*Id.* The Epic then links Matthew's death to the Defendants' protest activities, stating:

> God rose up Matthew for the very purpose of striking him down, so that God's name might be declared throughout all the earth. He killed Matthew so that His servants would have an opportunity to preach His words to the U.S. Naval Academy at Annapolis,

> the Maryland Legislature, and the whorehouse called
> St. John Catholic Church at Westminster where Mat-
> thew Snyder fulfilled his calling.

*Id.* at 3973.

Notwithstanding the foregoing, the Epic cannot be divorced from the general context of the funeral protest. Indeed, it is patterned after the hyperbolic and figurative language used on the various signs. Again, in assessing the First Amendment issue, we must evaluate a reasonable reader's reaction to the Epic, in light of its context and general tenor. *See Biospherics*, 151 F.3d at 184-85. In context, the Epic is a recap of the protest and was distributed through the Church website, which would not lead the reasonable reader to expect actual facts about Snyder or his son to be asserted therein.

The general tenor of the Epic also serves to negate any impression that it was the source of any actual facts. In preparing it, the Defendants interspersed strong, figurative language with verses from the Bible. They utilized distasteful and offensive words, atypical capitalization, and exaggerated punctuation, all of which suggest the work of a hysterical protestor rather than an objective reporter of facts. Despite referring to the Snyder family by name, the Epic is primarily concerned with the Defendants' strongly held views on matters of public concern. Indeed, the Epic explains that Matthew's death in Iraq gave the Defendants the "opportunity to preach [God's] words to the U.S. Naval Academy at Annapolis [and] the Maryland Legislature," J.A. 3973, where they protested on the very day of Matthew's funeral. Finally, the Defendants' extensive funeral picketing activities predated Matthew's funeral and continue to this day throughout the country, with many of the signs displayed at Matthew's funeral also being displayed in other protests.

Thus, even when the Snyders are mentioned in the Epic, a reasonable reader would understand its contents to be primar-

ily focused on the more general message to which their protests are directed. The Defendants assert in the Epic, for example, that the Snyders had incurred God's wrath by raising Matthew as a Catholic and allowing him to serve in the military — assertions a reasonable reader would take as focused on the Defendants' concerns with the policies and activities of the Roman Catholic Church and the military. Furthermore, a reasonable reader would take as rhetorically hyperbolic a text describing the "United States of Sodom" as a "filthy" country, labelling the Catholic Church as a "pedophile machine," and equating the Maryland Legislature with the Taliban. In that context, the reasonable reader would understand the other assertions of the Epic — that the Snyders raised their son "for the devil," and taught him to "defy his Creator, to divorce, and to commit adultery" — as simply "loose, figurative, or hyperbolic language" not connoting actual facts about Matthew or his parents. *Milkovich*, 497 U.S. at 21. Thus, a reasonable reader would not understand the Epic to assert actual facts about either Snyder or his son.[20]

## C.

Notwithstanding the distasteful and repugnant nature of the words being challenged in these proceedings, we are constrained to conclude that the Defendants' signs and Epic are constitutionally protected. To paraphrase our distinguished colleague Judge Hall, judges defending the Constitution "must sometimes share [their] foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply. It is a fair summary of history to say that the safeguards of liberty have often been forged in controversies involving not very nice people." *Kopf v. Skyrm*,

---

[20]The district court recognized the nonfactual basis of the Epic when it dismissed Snyder's defamation claim. In so ruling, the court observed that the statements found therein were "essentially [the Defendants'] religious opinion and would not realistically tend to expose Snyder to public hatred or scorn." *Snyder*, 533 F. Supp. 2d at 572-73.

993 F.2d 374, 380 (4th Cir. 1993) (internal quotation marks omitted).

Nonetheless, the various states and localities, as well as grieving families, may yet protect the sanctity of solemn occasions such as funerals and memorials. Indeed, governmental bodies are entitled to place reasonable and content-neutral time, place, and manner restrictions on activities that are otherwise constitutionally protected. Some "breathing space" for contentious speech is essential, however, under the Free Speech Clause. *See New York Times*, 376 U.S. at 272. As the Court long ago emphasized:

> To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of citizens of a democracy.

*Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940). Because the judgment attaches tort liability to constitutionally protected speech, the district court erred in declining to award judgment as a matter of law.

IV.

Pursuant to the foregoing, the judgment of the district court is reversed and the various appeal bonds are hereby discharged.

*JUDGMENT REVERSED*
*AND BONDS DISCHARGED*

SHEDD, Circuit Judge, concurring in the judgment:

Although I agree with the majority that the judgment below must be reversed, I would do so on different grounds. As I explain below, I would hold that Snyder failed to prove at trial sufficient evidence to support the jury verdict on any of his tort claims. Because the appeal can be decided on this non-constitutional basis, I would not reach the First Amendment issue addressed by the majority.

I.

A.

Under the doctrine of constitutional avoidance, we are to avoid constitutional determinations when other grounds exist for the disposition of the case. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotations marks omitted); *see also Bell Atl. Md., Inc. v. Prince George's County*, 212 F.3d 863, 866 (4th Cir. 2000) (holding that "by deciding the constitutional question of preemption in advance of considering the state law questions upon which the case might have been disposed of, the district court committed reversible error"). Because the viability *vel non* of the state torts is dispositive as a nonconstitutional ground on which to decide this case, I would proceed to consider that issue in the first instance. To do otherwise would turn the principle of constitutional avoidance on its head; rather than avoiding unnecessary constitutional issues, we allow the parties to structure the case in order to force us to reach constitutional issues.

Neither the Phelps nor Snyder argue on appeal that the torts are deficient as a matter of law. Ordinarily, where a party fails to raise an issue in its opening brief, we deem the issue to be waived. *See Cavallo v. Star Enterprise*, 100 F.3d 1150, 1152

n.2 (4th Cir. 1996). Moreover, where an issue is raised only in an amicus brief, we generally decline to consider it. *See United States v. Buculei*, 262 F.3d 322, 333 n.11 (4th Cir. 2001). However, that rule is not absolute, and I believe it is within our authority to consider an issue not raised by the parties.

Our judicial power to decide a case is not limited by the arguments and actions of the parties. Moreover, while we "normally" decline to decide an issue not raised by the parties, "normally" necessarily implies that we are not precluded from doing so under certain circumstances. *See Carter v. Lee*, 283 F.3d 240, 252 (4th Cir. 2002) (noting that "this Court *normally* views contentions not raised in an opening brief to be waived") (emphasis added); *see also Cousin v. Trans Union Corp.*, 246 F.3d 359, 373 n. 22 (5th Cir. 2001) (noting that although issues not raised in initial brief are normally waived, the court has discretion to decide the issue); *Bridges v. City of Bossier*, 92 F.3d 329, 335 n. 8 (5th Cir. 1996) (electing to examine purely legal issue not raised by party in opening brief, but raised by amicus curiae in its initial brief); *Estate of Lisle v. C.I.R.*, 341 F.3d 364, 384 (5th Cir. 2003) (holding that "[w]hile we may in our discretion decline to consider issues not raised in an initial brief, we choose to address the issue here"). Indeed, the Supreme Court has approved this practice. *See Teague v. Lane*, 489 U.S. 288, 300 (1989) (plurality opinion); *see also Davis v. United States*, 512 U.S. 452, 457 n.1 (1994).

A case from the United States Court of Appeals for the District of Columbia Circuit is instructive on this point. *See Independent Ins. Agents of America, Inc. v. Clarke*, 955 F.2d 731 (D.C. Cir. 1992) (disposing of a case on a basis not advanced by the parties), *rev'd on other grounds sub nom. U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 445-47 (1993). In denying rehearing *en banc*, a judge of that court noted

Our colleagues question the "judicial power" of a federal court to decide an issue of law concededly dispositive of the case where parties have not raised the issue. *I think it most apparent that federal courts do possess this power. The alternative is that the parties could force a federal court to render an advisory opinion.* What the dissenters in effect argue is that the parties can stipulate to the state of underlying law; frame a law suit, assuming that stipulation; and obtain from the court a ruling as to what the otherwise dispositive law would be if the stipulated case were in fact the law. Indeed, that is precisely what would have occurred in this case had the panel not, *sua sponte*, raised the question . . . .

*Independent Ins. Agents of America, Inc. v. Clarke*, 965 F.2d 1077, 1078 (D.C. Cir. 1992) (Sentelle, J., concurring)(emphasis added). Following the denial of rehearing *en banc*, the Supreme Court granted a writ of certiorari and specifically noted that the circuit court did have the authority to raise and decide an issue not raised by the parties. *See Independent Ins. Agents of America*, 508 U.S. at 447 (noting that "[t]he contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory"). Thus, I believe we have the power to decide issues not raised by the parties and should exercise that power under certain circumstances.

Here, moreover, the dispositive nonconstitutional ground is already before us as the Thomas Jefferson Center for the Protection for Free Expression ("the Center"), which we permitted to file an amicus curiae brief, argues that the underlying state law torts are legally deficient. *See* Brief of the Thomas Jefferson Center for the Protection of Free Expression, at 15-30. Specifically, the Center contends that Snyder failed to

establish that the Phelps intruded upon his seclusion or that the Phelps' activities are outrageous under Maryland law.

Thus, I am persuaded that we should consider the issues raised by the Center for several reasons. First, the Phelps clearly challenged the legal sufficiency of the state law torts in the district court by way of a motion for summary judgment and later in their post-trial motions. Second, Snyder has directly responded in this appeal to the issues that the Center raises. Third, and most importantly, the principle of constitutional avoidance requires us to avoid constitutional determinations when other grounds exist for the disposition of the case. Here, because the state law torts are not supported by the evidence presented at trial, I would reverse under state law and not under the First Amendment.

B.

Under Count One, the jury found the Phelps liable for the state law tort of "invasion of privacy by intrusion upon seclusion" because the Phelps invaded Albert Snyder's privacy during his time of bereavement. The jury was instructed that the elements of this claim are: "(1) An intentional (2) intrusion or prying upon (3) something which is and is entitled to be private (4) in a manner which is highly offensive to a reasonable person." J.A. 3110. Snyder apparently claims an intrusion upon seclusion occurred because of the Phelps' funeral protest and the television coverage thereof, and because of the "epic" which he found on the Internet several weeks after the funeral.

Under Maryland law, an "intrusion" occurs when there has been some act that interferes "into a private place or the invasion of a private seclusion that the plaintiff has thrown about his person or affairs." *Furman v. Sheppard*, 744 A.2d 583, 586 (Md. Spec. App. 2000) (internal citation and quotation marks omitted). Expounding on the types of "intrusion"

Maryland law recognizes, the Maryland Court of Appeals has stated:

> [this tort] consists of intrusion upon the plaintiff's physical solitude or seclusion, as by invading his home or other quarters, or an illegal search of his shopping bag in a store. The principle has, however, been carried beyond such physical intrusion, and extended to eavesdropping upon private conversations by means of wire tapping and microphones; and there are decisions indicating that it is to be applied to peering into the windows of a home, as well as persistent and unwanted telephone calls. The tort has been found in the case of unauthorized prying into the plaintiff's bank account, and the same principle has been used to invalidate a blanket subpoena duces tecum requiring the production of all his books and documents, and an illegal compulsory blood test.
>
> It is clear, however, that there must be something in the nature of prying or intrusion . . . .

*Hollander v. Lubow*, 351 A.2d 421, 425-26 (Md. 1976) (internal citations and quotation marks omitted). Several cases illustrate the type of conduct which constitutes an "intrusion upon seclusion" under Maryland law.

In *Furman*, a private club member who had been a plaintiff in an earlier lawsuit in which he claimed to be injured, brought suit against a private investigator who worked for the defense counsel in that lawsuit and who trespassed into a private club to videotape the plaintiff sailing on his yacht. *Furman*, 744 A.2d at 585. The club was surrounded by a security fence with conspicuously posted "Trespassers will be Prosecuted" signs. *Id.* The Maryland Court of Special Appeals held that "[t]here is no liability for observing [the plaintiff] in public places since he is not then in seclusion." *Id.* at 586. Even

though he was in a private club, the court concluded that the plaintiff was in public because he was exposed to "public view by his neighbors and passers by." *Id.* at 587. Accordingly, the court ruled that there was no intrusion into his seclusion. *Id.*

In *Hollander*, the plaintiff sued several individuals and a bank for their revealing the fact that the plaintiff was a partner in a mortgage firm. *Hollander*, 351 A.2d at 422. For this, the plaintiff brought a claim for invasion of privacy by intrusion upon seclusion, among other claims. *Id.* The Maryland Court of Appeals held that there were no private facts revealed and, therefore, there was no intrusion upon seclusion. *Id.* at 426. The court elaborated:

> [t]he plaintiff cannot complain when an occupation in which he publicly engages is called to public attention, or when publicity is given to matters such as the date of his birth or marriage, or his military service record, which are a matter of public record, and open to public inspection. It seems to be generally agreed that anything visible in a public place can be recorded and given circulation by means of a photograph, to the same extent as by a written description, since this amounts to nothing more than giving publicity to what is already public and what anyone present would be free to see. *The contention that when an individual is thus singled out from the public scene and undue attention is focused upon him, there is an invasion of his private rights, has not been borne out by the decisions.* On the other hand, it is clear that when a picture is taken without the plaintiff's consent in a private place, or one already made is stolen, or obtained by bribery or other inducement of breach of trust, the plaintiff's appearance which is thus made public is still a private thing, and there is an invasion of a private right, for which an action will lie.

*Id.* (internal citation and quotation marks omitted) (emphasis added).

Additionally, where Maryland courts have recognized this cause of action, I find nothing analogous to Snyder's claim. For example, in *Mitchell v. Baltimore Sun Co.*, 883 A.2d 1008 (Md. Spec. App. 2005), a former congressman brought a cause of action for invasion of privacy by intrusion upon seclusion. His claim was based on two newspaper reporters who came to his nursing home room uninvited to purportedly investigate some of his unpaid bills. *Id.* at 1012. The reporters were aware that Mitchell was elderly and in failing health, and the nursing home had a sign that stated "NO TRESPASS-ING NO SOLICITING." *Id.* The reporters asked him a series of questions, and when he asked them repeatedly to leave, they refused. *Id.* at 1012. Finally, the congressman asserted "that one of the reporters looked through some files that he had in a filing cabinet, box, or on a desk near his bed." *Id.* 1012-13. In deciding to reverse summary judgment, the court held that these actions could constitute an intrusion upon seclusion under Maryland law. *Id.* at 1023-24.

In *Pemberton v. Bethlehem Steel Corp.*, 502 A.2d 1101 (Md. Spec. App. 1986), a local union president filed suit for intrusion upon seclusion based upon various types of surveil-lance the defendants conducted on him. The Maryland Court of Special Appeals held that placing a surveillance micro-phone on a hotel door in order to hear private conversations inside a hotel room may be actionable as an intrusion upon seclusion. However, the court further stated that other surveil-lance, such as watching the plaintiff's home from the street is not actionable as an intrusion upon seclusion because "there is no liability for observing [a person] in public places, since he is not then in seclusion." *Id.* at 1116-17 (internal quotation marks omitted).

In light of these cases, it is clear that there was no type of "intrusion" under any of the bases that Snyder asserts. First,

as to the funeral protest itself, the Phelps did not "intrude" or "pry" upon any private seclusion. The Phelps never intruded upon a private place because their protest occurred at all times in a public place that was designated by the police and located approximately 1,000 feet from the funeral. Further, the Phelps never confronted Snyder, and Snyder admits he could not see the protest. Finally, there was no intrusion because the evidence is undisputed that the church service was never disrupted. The Phelps never entered the church, and they stopped protesting when the church service began. In sum, I would hold the funeral protest did not intrude upon Snyder's seclusion.[1]

Likewise, I would hold that the Phelps' posting of the "epic" on their church Internet website is not, as a matter of law, an intrusion upon Albert Snyder's seclusion under Maryland law. In posting the "epic," the Phelps did not do anything to direct it to Snyder's attention, such as email or transmit it to him. *Cf. Hollander*, 351 A.2d at 426 (noting that repeated phone calls may give rise to an intrusion upon seclusion claim). Instead, Snyder learned of the "epic" during an Internet search, and upon finding it he chose to read it. By doing so, any interference with Snyder's purported interest in seclusion was caused by Snyder himself rather than the Phelps.

In short, I conclude that the verdict on Count One cannot stand. The evidence is insufficient under Maryland law for the jury to have found that the Phelps committed any act that intruded upon Snyder's right to seclusion.

---

[1]To the extent Snyder's claim is based on his viewing the Phelps' protest on television, I would find that television coverage of a public protest that occurred in a public area is not an "intrusion." *Cf. Hollander*, 351 A.2d at 426 (noting that "[i]t seems to be generally agreed that anything visible in a public place can be recorded and given circulation by means of a photograph, to the same extent as by a written description, since this amounts to nothing more than giving publicity to what is already public and what anyone present would be free to see").

## C.

Under Count Two, the Phelps were held liable for intentional infliction of emotional distress. As charged to the jury, the elements for this tort are: (1) the Phelps' conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress to Snyder; and (4) the emotional distress was severe. J.A. 3111.

Under Maryland law, the second element requires conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Pemberton*, 502 A.2d at 1115 (internal citation and quotation marks omitted). The Maryland Court of Special Appeals has held that "[t]he tort of intentional infliction of emotional distress is rarely viable, and is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Bagwell v. Peninsula Regional Medical Center*, 665 A.2d 297, 319 (Md. Spec. App. 1995) (internal citation and quotation marks omitted).[2] A review of Maryland cases illustrates the exacting burden of this element.

In *Figueiredo-Torres v. Nickel*, 584 A.2d 69 (Md. 1991), the Maryland Court of Appeals upheld a claim for intentional infliction of emotional distress by a plaintiff whose psychologist had sexual relations with the plaintiff's wife. The court concluded that there was evidence of extreme and outrageous conduct "where a psychologist who is retained to improve a marital relationship implements a course of extreme conduct which is injurious to the patient and designed to facilitate a romantic, sexual relationship between the therapist and the patient's spouse." *Id.* at 75.

---

[2] A 1997 case of the Maryland Court of Special Appeals noted that the tort of intentional infliction of emotional distress had been upheld on only three occasions since Maryland began recognizing the tort in 1977. *See Penhollow v. Cecil County*, 695 A.2d 1268, 1285 (Md. Spec. App. 1997).

In *B.N. v. K.K.*, 538 A.2d 1175, 1177 (Md. 1988), the Maryland Court of Appeals upheld a claim for intentional infliction of emotional distress where the defendant failed to disclose to the plaintiff that he had a sexually transmitted disease prior to having sexual relations with her. The plaintiff thereafter contracted this disease. *Id.* The court noted that the element of extreme and outrageous conduct was supported because of the risks and side effects of the disease the plaintiff contracted from the defendant. *Id.* at 1180.

In a final case where the Maryland Court of Appeals has upheld a claim of intentional infliction of emotional distress, the plaintiff had suffered physical and emotional trauma from being assaulted at work. *See Young v. Hartford Accident & Indem. Co.*, 492 A.2d 1270, 1271 (Md. 1985). After making disability payments, the defendant refused to pay certain doctor's bills and insisted the plaintiff undergo another psychological evaluation despite a doctor's warning of her fragile condition. *Id.* The court held that "[i]f [the plaintiff] proves that the sole purpose of [the psychologist's] examination was to harass the Plaintiff into abandoning her claim, or into committing suicide," the behavior would be extreme and outrageous. *Id.* at 1278 (internal quotation marks omitted).

On the other hand, Maryland has refused to uphold the tort in the context of other types of egregious conduct. In *Mitchell*, the two reporters entered a former congressman's nursing home room uninvited, and looked through his files without permission. *See* 883 A.2d at 1012-13. Even though the congressman was in failing health and the reporters had been asked to leave, the court held that these facts did not show extreme and outrageous conduct and stated that "[w]e are not persuaded that the reporters' questioning of Mitchell, even if conducted while trespassing, exceeded all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 1025 (internal citation and quotation marks omitted).

In *Batson v. Shiflett*, 602 A.2d 1191 (Md. 1992), the president of a local union was continually harassed by the defendants in an attempt to remove him from local office and to undermine his position. The plaintiff alleged that the defendants defamed him and committed the tort of intentional infliction of emotional distress. *Id.* at 1195. The court upheld the defamation claim but held that even though the defendant's conduct was defamatory, it "in no way satisfies our exacting standard for 'extreme and outrageous conduct.'" *Id.* at 1217.

In this case, Snyder asserts that the protest was extreme and outrageous because the funeral was disrupted by having the procession re-routed; his grieving process was disrupted by his having to worry about his daughters observing the Phelps' protest; and the Phelps' messages on their protest signs were focused on his family. As earlier noted, the protest was confined to a public area under supervision and regulation of local law enforcement and did not disrupt the church service. Although reasonable people may disagree about the appropriateness of the Phelps' protest, this conduct simply does not satisfy the heavy burden required for the tort of intentional infliction of emotional distress under Maryland law. Further, to the extent Snyder asserts the "epic" as a basis for this tort, I would find the "epic," which the district court found to be non-defamatory as a matter of law, is not sufficient to support a finding of extreme and outrageous conduct. Therefore, I believe the verdict on Count Two must be reversed.[3]

---

[3]The Phelps were also held liable for civil conspiracy under Count Three. Because the unlawful activity required for this count was the substantive offense of Count 1 or Count 2, this count must also be reversed. *See Green v. Washington Suburban Sanitary Commission*, 269 A.2d 815, 824 (Md. 1970) (noting that "[a] civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act").

## II.

In sum, I find the evidence cannot support the state torts at issue in this appeal and, therefore, I would not reach the First Amendment analysis the majority implores. Accordingly, I concur only in the result the majority reaches — the reversal of the judgment below.